CHICAGO—FIRST DISTRICT—JUNE, 1923.    45

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

## The Stevens-Davis Company, Appellee, v. Mather & Company and George C. Mather, Appellants.

### Gen. No. 27,765.

1. COURTS—*duty of Appellate Court to follow Illinois Supreme Court as against Federal Supreme Court.* The Appellate Court is bound by the decisions of the Supreme Court of the State, fixing the "palming off" rule in cases of alleged unfair competition, as the only rule of decision, as against the decision of the United States Supreme Court that such rule is not the only ground for equitable relief in unfair competition, where no question of the construction of the constitution or laws of the United States is involved.

2. INJUNCTIONS—*"palming off" goods as those of another as the essence of enjoinable unfair competition.* Unfair competition which may be enjoined consists in the sale of the goods of one manufacturer or vendor for those of another, and if a merchant so conducts his business as not to "palm off" the goods manufactured and sold by him, as those manufactured and sold by another, equity will not afford relief by injunction against the acts and practices complained of, even though they are unethical or reprehensible.

3. INJUNCTIONS—*proof required to establish unfair competition in injunction suit.* A complainant seeking injunctive relief against alleged unfair competition is not required to prove unfair competition beyond a reasonable doubt, nor is proof by a mere preponderance of the evidence sufficient, but the right to such relief must be clearly established by the evidence.

4. FRAUD AND DECEIT—*employing competitor's salesmen not enjoinable unfair competition.* No enjoinable act of unfair competition is shown by evidence that certain salesmen who had first been employed by defendant in the sale of certain advertising and other similar publications and had left his employ to enter the service of complainant in the sale of pay envelope card service, a line of business not then engaged in by defendant, were reemployed by defendant in the sale of a competing line of pay envelope card service, even though defendant induced them to return to employment with it as part of a scheme to engage in such line of work.

5. FRAUD AND DECEIT—*when enjoinable use of competitor's "trade secrets" not shown.* No ground for injunction against unfair competition under the "palming off" rule is shown by evidence that defendant, which engaged in the business of publishing and selling pay envelope cards after it had employed certain salesmen who had

been employed by complainant in the sale of similar cards, had been furnished by such salesmen with samples of the cards published by complainant, together with complainant's instructions to salesmen, lists of complainant's customers, routes for salesmen, and detailed information of the nature of complainant's business, and that defendant had used such information in the development of its card business, where it is shown that the cards were sold by complainant on the open market, and the other information did not constitute "trade secrets" as a matter of law.

6. FRAUD AND DECEIT—*obtaining information as to competitor's business by unethical means not unfair competition.* It is not unfair competition which may be enjoined to obtain a copy of a confidential report of a convention of a competitor's salesmen, containing their views and experiences relating to the sale of their employer's products, even though reprehensible and unethical means were resorted to to secure the report.

7. FRAUD AND DECEIT—*enticing away competitor's employees not unfair competition.* Attempting to entice a competitor's employees from their employment does not constitute unfair competition under the "palming off" rule.

8. FRAUD AND DECEIT—*when unfair competition by pirating competitor's publications not shown.* Unfair competition based on the alleged pirating of complainant's pay envelope card service called "Success Talks," no claim of copyright infringement being made, is not shown by evidence that defendant commenced the publication and sale of a similar service known as "Steps to Success," that defendant's cards are substantially identical in size and general physical appearance with those of complainant, and tending to show that defendant may have used complainant's cards as guides in the preparation of its service, where the type, style and typographical makeup, tinting of the cards and colors of paper used are substantially different, the language and subject-matter dissimilar, the titles do not coincide, the ideas and illustrations are different, and the subjects treated in both series are the fundamental virtues and kindred topics, and neither the subject-matter or thought is original in either series, and the cards, in neither case, were intended for general sale by display to casual purchasers but were sold to discriminating and experienced purchasers after inspection and examination.

9. APPEAL AND ERROR—*consideration on appeal of exhibit not bearing master's mark.* A book which was referred to and offered in evidence in the hearing before the master in an injunction proceeding, but which the master stated need not be actually produced, will be considered by the Appellate Court as properly in evidence where it was sent to the upper court as an original

exhibit and was discussed as such by counsel for both parties, although it does not bear the master's mark.

10. TRADE MARKS AND TRADE NAMES—*when "success" not shown to have acquired secondary meaning by trade usage.* In a proceeding to enjoin a publisher from using the phrase "Steps to Success" as the title for a pay envelope card service, sold in competition with a similar service published by complainant under the name "Success Talks," on the ground that by complainant's prior use, the word "Success" had acquired a secondary meaning in connection with such services, such secondary meaning is not shown by the evidence where it appears that complainant's customers, who are claimed to have been deceived by the similarity in names, did not know what name complainant's service was known by or who the publisher was or associated the word with the cards of any particular publisher, and that similar publications were made by .other persons under somewhat similar titles long prior to complainant's use of the word, and that neither the idea of pay envelope cards nor the subject-matter thereof was original with complainant.

11. FRAUD AND DECEIT—*use by competitor of similar salesman's portfolio not unfair competition.* No right to injunctive relief against unfair competition can be predicated on the use by a competing publisher of a salesman's display portfolio in imitation of that used by complainant for its salesmen, where the evidence shows that such portfolios can be purchased on the open market at stationery stores.

12. FRAUD AND DECEIT—*pirating instructions to salesmen not enjoinable unfair competition.* No enjoinable act of unfair competition under the "palming off" rule is shown by evidence tending to show that defendant plagiarized complainant's instructions to salesmen where no claim of copyright infringement is made and the evidence shows that "Sales Talks," which is claimed to have been copied, was not to be sold on the market but used for the education of new and inexperienced salesmen, and was not an original production and that both parties prepared their instructions by using standard works on salesmanship for reference and guidance.

13. FRAUD AND DECEIT—*obtaining testimonials from competitor's customers by unethical means not unfair competition.* No ground for injunction against unfair competition is shown by evidence that before commencing the publication and sale of a set of pay envelope cards similar to those published by complainant, defendant addressed customers of complainant whose names were obtained by defendant, from former employees of complainant, with a misleading letter soliciting testimonials as to the pay envelope card service published by complainant, such letter inferentially

representing that the writer was seeking information as to the merits of the system as a prospective user, especially where there is no evidence of specific instances in which testimonials so obtained were represented by defendant to be testimonials of its competitive publication and the evidence tends to show that defendant instructed its salesmen to use the testimonials as recommendations of the scheme or system and not of its cards.

14. FRAUD AND DECEIT—*when specific instance of unfair competition by "palming off" not shown by evidence.* The rule that unfair competition by "palming off" must be clearly established before injunctive relief will be granted is not satisfied by the evidence as to a specific instance in which defendant is claimed to have sold its pay envelope card system by falsely representing that it was the service of complainant, where the only evidence of the transaction consists of the deposition of a biased witness who was hostile to defendant, whose testimony is vague, uncertain, contradictory and inconsistent, was principally given in response to leading and suggestive questions, was based on impressions and opinions as to the representations made by defendant's salesman a year before the testimony was given, and where he did not testify as to any representations made in reference to the cards but only as to ambiguous representations with reference to certain testimonial letters used by the salesman, and it appears that he did not rely upon the representations but purchased the cards after an independent investigation and correspondence with both complainant and defendant and with full knowledge that he was dealing with defendant, and that he did not know that complainant's service was published by it or that the services of the two parties were known by different names.

15. FRAUD AND DECEIT—*unfair competition not provable by inference, impressions or assumptions.* Specific instances of alleged unfair competition by defendant in the sale of its pay envelope card service to customers of complainant are not sufficiently established as grounds for injunction by evidence that such customers inferred, or "assumed," or had the "impression" that defendant's salesmen represented the cards sold by them to be those published by complainant, where there is no evidence of specific representations to that effect by such salesmen or that such salesmen represented that defendant had taken over the pay envelope card service or that complainant had discontinued the service published by them, and there is evidence that the customers in question bought the service from defendant with full knowledge that they were dealing with it and not with complainant, and where the representations made amounted only to "puffing" or to trade slander.

16. FRAUD AND DECEIT—*customer's mistake as to identity of seller not evidence of unfair competition.* Evidence that a pur-

chaser of pay envelope cards from defendant bought the cards thinking he was dealing with complainant, from whom he had bought a similar card service, does not establish unfair competition by defendant where the evidence shows that defendant's salesman did not represent that the cards were those of complainant but shows that he told the purchaser that he represented defendant.

17. Injunctions—*when violation of federal statute by complainant in injunction not within maxim of "clean hands."* A complainant for injunction against unfair competition based in part upon the alleged pirating of its pay envelope card system by defendant is not barred from relief on the ground that it comes into equity with unclean hands, by its violation of the copyright law, where no question of copyright infringement is involved.

18. Injunctions—*giving false testimony as to immaterial matter, not bar under maxim of "clean hands."* A complainant in injunction is not barred from relief under the maxim of "unclean hands" by the fact that its president gave false testimony as to an immaterial matter during the course of the hearing.

19. Injunctions—*failure to offer evidence as to necessity for preliminary injunction not within maxim as to "clean hands."* The failure of complainant to offer any evidence to sustain the averments of an affidavit for the issuance of a preliminary injunction on the ground of imperative necessity does not violate the maxim that complainant must come into equity with clean hands.

20. Injunctions—*attempting to have postal authorities stop defendant's mail not within maxim as to "clean hands."* A complainant in injunction against defendant for unfair competition is not shown to have come into equity with unclean hands by evidence that after the issuance of a preliminary injunction against defendant, complainant's president sent a copy thereof to the post office officials and endeavored to get them to stop all mail for defendant and allied companies and that as a result of charges made by him, defendant's president was reprimanded by the postal authorities.

21. Injunctions—*when evidence insufficient to bar complainant under maxim of "clean hands."* The maxim that a complainant in injunction for unfair competition must come with "clean hands" is not shown to have been violated by evidence that a salesman for complainant induced a customer of defendant to cancel an order by charging that defendants were "a set of fakes" and that another salesman made certain charges against defendant to another customer and sought to induce the latter customer to join with complainant in a suit against defendant where there is no evidence that the statements were authorized or sanctioned by complainant, and the testimony as to such matters is vague and indefinite.

22.  INJUNCTIONS—*when complainant in injunction for unfair competition barred by unclean hands.* A complainant in injunction for unfair competition is barred from relief by unclean hands where the evidence shows that it planted its own employees in its competitor's employ to secure for it lists of the competitor's customers, employed spies to enter the employ of the competitor to obtain information as to its business, methods, trade secrets, etc., and debauched an employee of the competitor for the same purpose, secured confidential information from an employee of the competitor by means of misleading and deceptive letters, procured lists of the competitor's customers from one of its salesmen by means of a pretended prospective purchase of the competitor's service, circularized the competitor's customers with a copy of a preliminary injunction issued without notice and a pamphlet entitled "Evidence of Fraud" in which many charges were made against the competitor, and had salesmen of the competitor arrested on trumped-up charges and took correspondence and papers from such salesmen by means of a search warrant while they were under arrest.

23.  INJUNCTIONS—*when inequitable acts of complainant amounting to "unclean hands" not justifiable.* Inequitable acts of complainant amounting to a violation of the maxim that one who comes into equity must come with clean hands are not justifiable on the ground that they were done for the purpose of securing evidence for a suit to enjoin defendant from unfair competition and that defendant sustained no pecuniary injury from them, especially where many of the acts in question were not committed for the purpose of obtaining evidence, and the information so obtained was not used as evidence but for the purpose of injuring defendant in its business relations.

Appeal by defendants from the Superior Court of Cook county; the Hon. CHARLES M. FOELL, Judge, presiding. Heard in the first division of this court for the first district at the March term, 1922. Reversed and remanded with directions. Opinion filed June 25, 1923.

FREDERICK A. BROWN, for appellants; ROBERT ELDEN MATHEWS, of counsel.

MATHER & HUTSON, for appellee; LAWRENCE C. TRAEGER, of counsel.

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

Mr. Justice Johnston delivered the opinion of the court.

·This is an appeal by Mather & Company and George C. Mather, appellants, from a decree of the superior court of Cook county granting an injunction against appellants substantially in accordance with the prayer of the bill of complaint of the Stevens-Davis Company, appellee. The material allegations of the bill stated briefly are as follows: The Stevens-Davis Company, appellee, has been for many years engaged in the business of "promoting human efficiency" for the employees of "large employers through inspiration and educational work." Appellee has built up a successful business throughout the United States, and employs a large number of people whose time is exclusively devoted to such work. The business is conducted by selling to employers a series of fifty-two small colored cards on which are printed "talks to employees" on virtues such as loyalty, enthusiasm, harmony, cheerfulness, temperance and "other topics." The cards are to be distributed to the employees through their weekly pay envelopes. Appellee has given to this "system or service" the name of "Success Talks," and has bound the cards in book form. Appellee alleges that appellants "have been and now are engaged in business for the sole purpose of plagiarizing the system, services, products and forms" of appellee and of "so imitating and copying" appellee's business. Appellants have named their pay envelope cards "Steps to Success," taking thereby the important word "Success" used by appellee in the name of its cards. The "Success Talks" which are used by appellee "are written on fifty-two titles or topics" and were originated by appellee. "Substantially the same list of topics or titles in the same sequence as used" by appellee has been adopted by and is now used by appellants. The cards of appellee have been copied by appellants in "size, style, color

52 APPELLATE COURTS OF ILLINOIS.

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

scheme, ruling type and design," but the language of the cards although "varied somewhat" is the same in "thought, spirit and substance." Appellants "not satisfied with the purloining of the system and products" of appellee, "resorted to a most wrongful, fraudulent and dastardly practice of obtaining" testimonials or indorsements for their pay envelope cards. They "wrongfully procured a list of the customers" of appellee, wrote to these customers falsely representing that they, appellants, "had in contemplation the purchase of the said 'Success Talks' of" appellee, "and the use of same by distribution in the pay envelopes of their own employees." Appellants obtained responses from many of appellee's customers "indorsing and commenting on the genius and ability" of appellee, "and the merits of its said pay envelope lectures to employees." Appellants made photographic copies of the "testimonials" or "indorsements" and used them as "testimonials" or "endorsements" of their own pay envelope cards. When the customers ascertained "the imposition that had been practiced upon them" they "canceled contracts" with appellants "and rescinded their said letters of recommendation." Nevertheless appellants "have wrongfully used and are now using the said testimonials" to the "great detriment and injury" of appellee. By trading upon the "prestige" of appellee in one instance appellants obtained an "order of over a million cards" from the Worthington Pump Company of New York City, which had been a customer of appellee, and when it gave the order was buying the products of appellee. Appellants "have represented that they have succeeded to the business" of appellee "and that the continuance of the 'Success Talks' and similar work is now being prosecuted and conducted solely by them"; and "that through said gross misrepresentations and their fraudulent methods" they "have secured orders from customers of" appellee "when

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

such customers thought they were purchasing a continuation of" appellee's "service." In the perpetration "of the frauds hereinabove set forth," appellants "induced two of their employees to enter the employment" of appellee and "said employees in the course of their said employment obtained copies of the fifty-two 'Success Talks' of" appellee, "and all its forms, lists of customers, etc."; that these employees "were again taken back into the employ of" appellants and that they "turned over to" appellants "all of the said papers, documents, information, and trade secrets" of appellee. It is charged by appellee that "the said acts constituted unfair business competition and piracy in that the said emissaries of" appellants "obtained secret information" from appellee. It is further charged by appellee that the method by which the "testimonials" were obtained constituted "unfair competition"; and further that appellants "are guilty of piracy in using" appellee's "testimonials as testimonials of" appellants' work. Appellee claims that it has sustained "great loss and damages to its trade and business"; that it has no adequate remedy at law; and that it is entitled to an "accounting of profits made by" appellants in the "fraudulent sale of their goods in the name" of appellee. The bill alleges that the individual appellants "are persons of no financial standing and that they are insolvent"; that the appellant "Mather & Company, a corporation, has no tangible or valuable property" or "assets except such contracts and funds as it has recently secured by piratical methods from" appellee; and that "it is imperatively necessary that an injunction be issued." The bill prayed that "an account may be taken" and that the appellants be required to pay to appellee "whatever shall appear to be due to it upon the taking of such account." The bill also prayed for a preliminary injunction restraining the appellants as follows: (1) From obtaining testimonial letters; (2)

54     APPELLATE COURTS OF ILLINOIS.

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

from using the testimonial letters already obtained; (3) from representing that the appellants are the "authors, owners, vendors, or users of the 'Success Talks'" or "of any of the products" of appellee; (4) from representing that appellants "have taken over or have the right to use said 'Success Talks'" or that "they have in any manner purchased or succeeded to the business of" appellee; (5) from "using any of the lists of topics or names of the said fifty-two weekly 'Success Talks' of" appellee or "of any of its forms, printed matter, system or devices where the appellants obtained such information from the employees of said" appellee "secretly and without the knowledge and consent of said" appellee; (6) "from photographing any letters recommending the work or products" of appellee or "from using any photographs heretofore taken" of such work or products; (7) "from infringing upon any of the trade secrets of" appellee or "indulging in any manner in any unfair business competition with said" appellee and "from manufacturing or selling pay envelope cards of any kind or description so made or produced in form, size, color scheme, ruling, printing and general appearance as to be or appear to be like the 'Success Talks' of" appellee or "to deceive or tend to deceive the public into thinking that the products of the" appellants "were in fact those of" appellee.

Attached to the bill is an affidavit of Roderick G. Stevens, president of Stevens-Davis Company, appellee, stating, among other things, in substance that the rights of appellee "will be unduly prejudiced if an injunction is not issued immediately or without notice to" appellants because of the fact that "many of the contracts" of the present customers of appellee "are expiring on September 16, 1918 (the date that the bill was filed), and daily for some days thereafter"; that the agents of appellants "are about to and will solicit said customers and obtain from them contracts for

the ensuing year" to appellee's "great financial loss, running into thousands of dollars if said" appellants "are not restrained on September 16 and immediately thereafter"; and that appellants "have not sufficient financial standing or assets to pay the damages and injuries sustained by" appellee. On the same day that the bill was filed a preliminary injunction was issued by the court, without notice, substantially in accordance with the prayer of the bill. An answer was filed by appellants on September 30, 1918, denying the wrongful and fraudulent acts charged by the bill. On November 21, 1918, the cause was referred to a master. On June 3, 1920, a petition was filed by appellee alleging that the injunction had been violated and asking for a rule on appellants to show cause why they should not be punished for contempt. The petition specifically alleged that the George Cutter Company had given an order for cards to appellant "under the impression and in the belief" that it was ordering the cards of appellee; that Bartlett and McMahon, former employees of appellee, had entered the employ of appellants as agents for the latter in Boston, and had in their possession secret data and valuable documents of appellee which they were wrongfully using in connection with their work for appellants; that appellee had Bartlett and McMahon arrested and by a search warrant recovered the data and documents; that appellants had written letters to "various persons" containing false statements in regard to the preliminary injunction. Appellants filed an answer denying that they had violated the injunction. The petition and answers were referred to the master. On November 20, 1920, appellee filed a supplemental bill which, after repeating and enlarging on many of the allegations in the original bill and in the petition for contempt, alleged that a secret convention of its salesmen was held in Chicago and that a report of the proceedings of the convention was printed; that this

report was found in the possession of appellants in Boston in February, 1919; and that it was wrongfully obtained by appellants.

The supplemental bill also charges that since the filing of the original bill appellants have been guilty of "unfair competition" and "other acts" injurious to the "business and good will" of appellee; and that appellants have wrongfully obtained the "business secrets" of appellee and have induced employees of appellee to divulge the "trade secrets" of appellee; and have endeavored to "hire salesmen and employees of" appellee. An answer was filed denying that appellants were guilty of any of the wrongful acts charged. A cross-bill was filed by appellant Mather & Company, alleging that after the entry of the preliminary injunction appellees "caused copies of the injunction suit to be printed and mailed to all of the customers and prospective customers" of appellant Mather & Company, and also "caused a 19-page folder to be printed and circulated accusing" appellant "Mather & Company of being 'a porch climber' and 'crooked.'" The cross-bill prays that appellee "may be enjoined from circulating malicious and slanderous words or matters relating to said" appellant Mather & Company. The cross-bill was not formally acted upon by the court, but it seems that the court directed both appellee and appellants to stop sending out letters or circulars in reference to the preliminary injunction. The master found that the equities were with appellee; recommended that the temporary injunction be made permanent; that appellants account to appellee for the profits; and further, that appellants were guilty of contempt, and imposed a fine of $500 on them.

The decree of the court, which is drastic and comprehensive, found that all the material allegations of the bill of complaint and supplemental bill were true and proved, and confirmed the findings of fact of the

master.    Jurisdiction of the cause was retained by the court for the purpose of stating an account between the parties of the lost profits sustained by appellee.    The master's fees and the costs amounted in the aggregate to $2,468.72.

The court specifically decreed that the appellants "have been guilty of unfair competition, and of wrongful and fraudulent business methods injurious to the good will, business and profits of" appellee, and ordered that a permanent injunction be entered against appellants and that they be restrained as follows:

"1.    From obtaining from The Stevens-Davis Co. or any of its employees or agents, or from any customers of The Stevens-Davis Co., any testimonials or any letters regarding, or recommendations of, the 'Success Talks' system or any of the productions of The Stevens-Davis Co.

"2.    From having in their possession or using any of said testimonials or lists of customers of The Stevens-Davis Co.

"3.    From representing to the public or any person or corporation that the defendants are the authors, owners, vendor or users of the 'Success Talk' pay envelope cards of The Stevens-Davis Co., or of any of the products of The Stevens-Davis Co.

"4.    From stating or implying to any person or corporation that the defendants, or any of them, have purchased or taken over, or have the right to use, said 'Success Talks' pay envelope cards of The Stevens-Davis Co., or any of its other products, or that they have in any manner purchased or succeeded to the business of said The Stevens-Davis Co., or any part thereof, or that said The Stevens-Davis Co. has gone out of business.

"5.    From photographing any letters recommending any work or production of The Stevens-Davis Co., or having the same in their possession, or from using any photographs heretofore taken or in the possession of any of the defendants, or their agents or salesmen,

or which may hereafter at any time be obtained by any of the defendants.

"6. From manufacturing, using, distributing or selling, or having in their possession, the pay envelope cards now manufactured and sold, or heretofore manufactured and sold by Mather & Company, called '*Steps To Success.*'

"7. From manufacturing, distributing or selling any pay envelope cards of such a character that the cards in their entirety shall be so similar to the 'Success Talks' pay envelope cards of The Stevens-Davis Co. as to be calculated to mislead persons purchasing them to believe that they are in fact the cards of The Stevens-Davis Co.

"8. From copying, printing, reproducing, using or distributing, in printed form, to the salesmen or agents of Mather & Company, or of any other corporation or association which the defendants may hereafter form, the 'Sales Talks' pamphlets and production of The Stevens-Davis Co.

"9. From using the name '*Steps to Success*' as the name of the pay envelope inclosures of the defendants, and from using the words '*Success Talks*' or either of them as descriptive of the pay envelope inclosures of the defendants.

"10. From informing customers, or any other persons or corporations, that the Stevens-Davis Co. did not originate and write the printed matter issued by said Company, and from stating that any of the products of the Stevens-Davis Co. were copied or plagiarized from other persons.

"11. From endeavoring to hire any salesmen of The Stevens-Davis Co. by means of any untruthful statements respecting the said The Stevens-Davis Co."

The first question to be determined in this case is, what is the nature of appellee's suit? What is the substantive ground for the equitable relief that is sought by appellee? There is some confusion in the bill and supplemental bill concerning this question. The suit does not seem to be based solely on unfair

competition. The bill and supplemental bill charge appellants with "unfair competition," it is true, but many of the acts so termed are not, as a matter of law, acts of unfair competition. Both of the bills allege that appellants have been guilty of other fraudulent and wrongful acts. · Both the bills allege, among other such acts, that appellants have been guilty of "piracy"; of inducing the employees of appellee to divulge appellee's "trade secrets"; of wrongfully obtaining knowledge of appellee's business secrets; of acts "of a serious character" injurious to the "business and good will" of appellee; of "piracy in evading or attempting to evade the copyrights" of appellee; of falsely stating that appellee had gone out of business and that appellants had taken over the "pay envelope card" business of appellee; of inducing two of their employees to enter the employment of appellee and obtain secret information of the business of appellee; and of endeavoring to "hire salesmen and employees of" appellee.

The decree of the court adjudges that appellants have been "guilty of unfair competition *and* of wrongful and fraudulent business methods injurious to the good will, business and profits of" appellee. There are twenty specific findings in the decree, but the terms "unfair competition," "unfair dealing," "unfair competition and methods," "unfair advantage," "unfair and false methods" are used in only five of the findings. It is obvious that the decree is not based exclusively on unfair competition. However, both counsel for appellee and counsel for appellants have argued the case as if it was one of unfair competition alone. Counsel for appellee expressly state in their brief that it is a case of "unfair competition." They have expressed their theory of the case as follows: "Appellants seem to have entirely misconceived this case. It is not a question of exclusive right in the word '*success*' or in the fifty-two weekly subjects, or

in *pay envelope cards* themselves, nor do we proceed under copyright. This is a case of *UNFAIR COM-PETITION* and the acts of M. Co. taken as a whole from first to last present one of the most flagrant cases to be found in the books anywhere.    *    *    * The question is, *Is one trader* trying to purloin another's business and reputation with a likelihood of success?" In order that there may be no mistake as to their position, counsel for appellee have printed the words "unfair competition" in large black type. In answering the contention of counsel for appellants that appellee "must clearly establish 'the palming off' of one man's goods as those of another," counsel for appellee say: "*We admit the law,* and most assuredly have made the proof." They also say: "Our evidence fulfills the rule" that "proof of unfair competition must be clear and convincing." In discussing their authorities they state that "The question to be decided in each case is: Is the defendant selling his goods as complainant's, or, in other words, is a false representation being made?" Counsel for appellee have made their position clear beyond the possibility of a doubt. If, in accordance with their theory of the case, they had indicated what acts of appellants in their opinion constitute unfair competition, the other alleged wrongful acts could be eliminated from consideration as substantive, independent instances of unfair competition, and could be considered, if relevant, merely as matters in aggravation of unfair competition. As counsel have not done this, but have argued all of the alleged wrongful acts of appellants as if they were acts of unfair competition, we must examine the alleged wrongful acts to determine whether, as a matter of law, they are wrongful, and, if so, whether they constitute unfair competition.

What is the legal meaning of unfair competition? It is necessary for us to find and to state precisely the rule of unfair competition, which we shall apply

as a test in determining what acts, if any, of appellants, constitute unfair competition. It is evident from the quotations we have cited from the brief of counsel for appellee that counsel conceive the rule to be the one familiarly known as the "palming off" of one man's goods as those of another. From our examination of the authorities, that is substantially the rule of almost universal acceptance. In this view of the rule, counsel for appellants concur. There may be some variations of the rule in a few exceptional cases where the courts have attempted to substitute their own ideas of business ethics for the objective rule of law; but such cases are so few in number that they may be treated as negligible. Furthermore, they proceed on an erroneous conception of the judicial process. Law is not the personal opinion of the judge, but it is a system of objective rules or standards. In *Stevens Linen Works v. William & John Don & Co.*, 121 Fed. (C. C. A.) 173, in speaking of unfair competition the court said: "There is a growing tendency in the courts to push this doctrine beyond what this court believes to be reasonable limits, and to introduce a spirit of paternalism into the administration of equity jurisprudence beyond the scope of its legitimate authority." Illustrative of the class of cases which constitute an exception to the general rule is the case of *Margarete Steiff, Inc. v. Bing,* 215 Fed. 204, where a district judge said (p. 206) that: " 'Unfair competition' consists in selling goods by means *which shock judicial sensibilities."* The courts which have attempted to "widen" or "broaden" the rule have proceeded on this theory, although they may not have stated their method so plainly and frankly.

Ordinarily, in a case of unfair competition, it would only be necessary to state the "palming off" rule without any citation of authorities. But the comparatively recent case of *International News Service v. Associated Press,* 248 U. S. 215, which holds that equitable relief

on the ground of unfair competition is not confined to the "palming off" cases, compels us to attempt to find the rule of unfair competition which we shall apply in the present case in determining whether the alleged wrongful acts of appellants constitute unfair competition. We are not attempting to distinguish that case from the case at bar, as the facts in the cases are dissimilar. In referring to the case of *International News Service v. Associated Press, supra,* the court said, in *Benjamin T. Crump Co., Inc. v. J. L. Lindsay, Inc.,* 130 Va. 144 (p. 146): "It is admitted by the appellant that until the recent decision of *International News Service v. Associated Press,* 248 U. S. 215, the established doctrine was that in order to justify a court of equity in granting an injunction to restrain unfair competition, the acts complained of must be of such a nature as to be likely to deceive the public, or to amount to an attempt to pass off one man's business or merchandise as that of another, and that this was essential in order to constitute unfair competition. It is, however, claimed, and argued with vigor and ability, that since that decision this doctrine, relied upon by the defendant, is no longer binding."

The question which now confronts us is, whether the "palming off" doctrine has been erroneously considered to be a rule of decision, when in fact it was merely a term descriptive of a typical class of cases; and if it has been correctly regarded as a rule of decision, is it the rule that has been adopted by the Supreme Court of this State? The "palming off" doctrine has been accepted by the courts in England and America, including the Supreme Court of the United States, with few exceptions, as the rule of law itself, and not as a descriptive term or classification of the most typical cases illustrative of the rule. It may be that it would have been better if the rule originally had been framed in more general terms, but the fact

is that it was not. "The legal doctrine of unfair competition is a development of the fundamental idea that it is against public policy that the goods of one person should be offered for sale or sold as those of another. Very few cases dealing with the question were decided in England or America prior to 1850." Nims on Unfair Competition and Trade-Marks (2nd ed.), p. 4. With the decision of the Supreme Court of the United States in the case of *Lawrence Mfg. Co. v. Tennessee Mfg. Co.*, 138 U. S. 537, which announced the "palming off" rule, "The doctrine of unfair competition may be regarded as being finally established in the United States; and as based not only on fraud on the public, but on the plaintiff." Hopkins on Trade-Marks and Unfair Competition (3rd ed.), p. 42.

In the comparatively recent case of *Hanover Star Milling Co. v. Metcalf*, 240 U. S. 403, the case of *Lawrence Mfg. Co. v. Tennessee Mfg. Co., supra*, was cited by the Supreme Court of the United States as an authority in support of the following holding of the court in regard to unfair competition (pp. 412, 413): "The essence of the wrong consists in the sale of the goods of one manufacturer or vendor for those of another."

In *Everett Piano Co. v. Maus*, 200 Fed. 718, the United States Circuit Court of Appeals, Sixth District, in considering a bill for an alleged interference with a business, said (p. 719): "The bill, in its averments, fails in a number of particulars respecting well-known grounds for equitable interference. *It does not state a case of unfair competition,* because it is *not averred* that defendant attempted to palm off any other kind of piano as that of complainant."

"The fundamental rule," says Nims, "is that one man has no right to palm off his own goods as the goods of a rival trader." Nims on Unfair Competition and Trade-Marks (2nd ed.), p. 12. Unfair competition may be defined as passing off, or attempting

64    APPELLATE COURTS OF ILLINOIS.

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

to pass off, upon the public the goods or business of one man as being the goods or business of another. Id., p. 15; 38 Cyc. 756; 26 R. C. L. p. 875. "'Unfair competition' is the equivalent term for the 'passing off' of the English and the 'Concurrence deloyale' of the French decisions." Hopkins on Trade-Marks and Unfair Competition (3rd ed.) p. 50.

In *Howe Scale Co. v. Wyckoff, Seamans & Benedict*, 198 U. S. 119, a leading case, the Supreme Court of the United States said (p. 140) that: "The essence of the wrong in unfair competition consists in the sale of goods of one manufacturer or vendor for those of another and if defendant so conducts its business *as not to palm off* its goods as those of complainant, *the action fails.*" It is unnecessary to cite the numerous decisions that have announced this rule. It may be confidently and positively stated that the rule has been adopted by nearly all of the courts of the United States, both federal and state. In harmony with the other jurisdictions, the Supreme Court of this state has adopted the "palming off" rule as the rule of decision in cases of unfair competition, and that rule has been repeatedly announced by this court and other appellate courts of the state.

In *Ball v. Siegel*, 116 Ill. 137, the court said (p. 146): The test is, whether the words used "would be likely to mislead persons in the ordinary course of purchasing the goods, and induce them to suppose they were purchasing the genuine article."

In *Hazelton Boiler Co. v. Hazelton Tripod Boiler Co.*, 142 Ill. 494, the court said (p. 509): "It is not shown that the defendant has ever attempted in any way to palm off its own boilers as being of the complainant's manufacture."

In *DeLong Hook & Eye Co. v. Hump Hairpin Mfg. Co.*, 297 Ill. 359, the court said (p. 369): "The burden of proof of the secondary meaning of the hump as referring to the appellee is upon the appellee * * *

to show that the use of the word by appellant will result in passing off its goods as the manufacture of the appellee''; and on page 371 the court quoted with approval from the case of *Howe Scale Co. v. Wyckoff, Seamans & Benedict,* 198 U. S. 119, which holds that unfair competition "consists in the sale of the goods of one manufacturer or vendor for those of another, and if defendant so conducts its business as not to palm off its goods as those of complainant, *the action fails.''*

In *Chicago Directory Co. v. Herringshaw,* 187 Ill. App. 489, the court said (p. 499): "Unfair competition consists in passing off or attempting to pass off upon the public the goods or business of one person as and for the goods or business of another.'' To the same effect are the cases of *Merchants' Detective Ass'n v. Detective Mercantile Agency,* 25 Ill. App. 250, 259; *Bender v. Bender Store & Office Fixture Co.,* 178 Ill. App. 203, 207; *Yellow Cab Co. v. Ensler,* 214 Ill. App. 607, 610; *Hughes v. West Pub. Co.,* 225 Ill. App. 58, 66; *Nestor Johnson Mfg. Co. v. Alfred Johnson Skate Co.,* 229 Ill. App. 549.

The courts in this State do not treat the "palming off'' doctrine as merely the designation of a typical class of cases of unfair competition, but they announce it as the rule of law itself—the test by which it is determined whether a given state of facts constitutes unfair competition as a matter of law. As the Supreme Court of this State said in the case of *De-Long Hook & Eye Co. v. Hump Hairpin Mfg. Co., supra,* quoting from the Supreme Court of the United States in the case of *Howe Scale Co. v. Wyckoff, Seamans & Benedict, supra:* "If defendant so conducts its business as not to palm off its goods as those of complainant, *the action fails.''* We are of the opinion from our examination of the authorities, that the "palming off'' doctrine has been followed by both the state and federal courts in an almost unbroken line of decisions, as a rule of law, and that the courts of

this state also deem it to be a rule of law. If it is not the rule of decision by which the facts may be tested, what is the general rule that has supplanted it? We are unable to discover any other general rule; and it is not within the jurisdiction of this court to formulate a rule of decision. Each case is not to be left to the discretion of the court to be decided according to the court's idea of justice and right. The "palming off" rule is expressed in a positive, concrete form which will not admit of "broadening" or "widening" by any proper judicial process. It is rigid and inelastic. It may be expressly overruled or amended and a new rule announced by a court of final authority, but it is not framed in such general terms that it may be extended under the guise of judicial construction. The better method would probably be to broaden it by legislation. According to the view we have taken, the Supreme Court of the United States holds that the "palming off" rule is not the only ground of equitable relief in unfair competition, and the Supreme Court of this State holds that it is the only rule of decision. The law announced by the Supreme Court of this State is a positive rule of law, and is as binding on this court as a statutory enactment. The decision of the Supreme Court of the United States, although entitled to the deference which is due to so distinguished a tribunal, is not a rule of decision that must be followed by a State court in the class of cases in question. In cases not involving the construction of the constitution or laws of the Union, the decisions of the Supreme Court of the United States are not binding as authority on the State courts. *Fuller v. Shedd*, 161 Ill. 462, 494; *Lebanon Bank v. Mangan*, 28 Pa. St. 452; *Doe ex dem. Shelton v. Hamilton*, 23 Miss. 496, 498.

We feel bound, therefore, to follow the rule of law of this State, and to hold that unfair competition "consists in the sale of the goods of one manufacturer or

vendor for those of another, and if defendant so conducts its business as not to palm off its goods as those of complainant, *the action fails.*" *DeLong Hook & Eye Co. v. Hump Hairpin Mfg. Co., supra.*

The next question to be determined is, what is the degree of proof imposed on one seeking relief on the ground of unfair competition? Counsel for appellants maintain that appellee must prove its case beyond a reasonable doubt and in support of their contention cite the case of *Candee, Swan & Co. v. Deere & Co.,* 54 Ill. 439. Counsel for appellee assert that they have established the right of appellee to relief by a "preponderance of the evidence." They refer to no authority. In our opinion neither contention is correct. It is true that in the case of *Candee, Swan & Co. v. Deere & Co., supra,* the court said (p. 467): "We believe the rule to be, in such cases, the proof must be clear, leaving the question beyond a reasonable doubt"; but although that case has not been expressly overruled it has not been followed in subsequent cases. The question involved in that case related to a violation of a trade-mark, but the "essential element is the same in trade-mark cases as in cases of unfair competition * * *. In fact, the common law of trademarks is but a part of the broader law of unfair competition." *Hanover Star Milling Co. v. Metcalf,* 240 U. S. 403, 413.

In the case of *Ball v. Siegel,* 116 Ill. 137, the court said (p. 147): "To entitle a complainant, in cases of this character, to the relief here sought, the right must be clearly established by the evidence."

The case of *DeLong Hook & Eye Co. v. Hump Hairpin Mfg. Co.,* 297 Ill. 359, followed the case of *Ball v. Siegel, supra,* citing, on page 372, the language quoted above from that case.

In our opinion appellee is required to prove its case clearly by the evidence, and a slight preponderance of the evidence is not sufficient; there must be a clear preponderance.

The issues in this case are largely ones of fact, and as the facts in no two cases are precisely the same, little assistance can be derived from a review of the many different cases on this subject. Each case must depend upon its own particular facts and circumstances.

The record in the present case is voluminous. The taking of the testimony before the master extended over nearly a year, namely, from November 16, 1920, to November 2, 1921. There are numerous exhibits, among which are several books on salesmanship, and one of an "inspirational" character. The briefs on both sides are lengthy. The record shows a bitter, hostile feeling to exist between the parties; and this feeling has been carried by both counsel into their briefs which exhibit instances of the most acrimonious argument, particularly the brief of counsel for appellee. Both counsel for appellants and counsel for appellee have several times referred us to the record, and have asked for a most careful consideration of the case. Counsel for appellants feel that because of the "crowded" condition of the trial courts "it is almost if not quite impossible for the trial court to do anything but confirm a master's report." Counsel for appellee state their attitude as follows: "Our only anxiety in this case is as to whether we can so present our brief as to inform this court as fully *as to the facts* as we did in the trial court." In view of the state of mind of both counsel, we have read nearly the entire transcript of the testimony contained in the record. From this reading we have discovered that the abstract of the evidence filed by appellants and the additional abstract filed by appellee are wholly inadequate in many material matters. A clear and intelligent understanding of the facts can only be obtained by reading the transcript of the testimony, or at least the transcript of the testimony of the important witnesses.

Counsel for appellee enumerate at the beginning of their brief twenty-two "specific wrongful acts of the defendants." We shall not state and discuss separately all of these acts at this time. Some of them are obviously not wrongs in themselves alone, and others are not "specific" wrongs. For example, the allegation that appellants "M. Co. built up a business from nothing in October, 1917, when incorporated, to 25 salesmen on the road in 1919," is clearly not a wrong in itself; and the averment that "many other improper practices were also indulged in by defendants below," is not specific. Counsel for appellants have set out in their brief, after the statement of their case, seven acts of appellee which they contend bar appellee from recovery in this cause on the doctrine of "unclean hands." We shall consider these acts later. It is clear that all of them do not come within the rule. As, for instance, the averments that appellee has violated the federal statutes on "Copyright" in regard to its cards; and that Stevens, its president, testified falsely on the hearing that he never attended the Sheldon School of Salesmanship.

We shall consider the various issues of fact which have been argued in the briefs of counsel. In reviewing the facts, if the rule of law, namely, the "palming off" rule, and the rule as to the degree of proof, which rule requires appellee's right to be clearly established by the evidence, are not kept constantly in mind, one is apt to get into inextricable difficulties. It must also be remembered that in this inquiry we are not concerned with unethical or wrongful acts generally, but our attention must be directed solely to such wrongful acts as come within the rule of unfair competition. We are not condoning unethical conduct merely because we may be of the opinion that such conduct does not, as a matter of law, constitute unfair competition. The different classes of wrongs must be distinguished in order that it may be determined whether the rem-

edy should be by law or equity. The remedy by equity is more drastic and of broader scope.

One of the first questions argued by counsel for appellee is that appellant Mather, the president of appellant Mather & Company, conceived the idea of "appropriating" the business of appellee, Stevens-Davis Company, and "induced" certain salesmen to leave appellee and to "go with him." These salesmen had formerly been in the employ of Mather in connection with a company of which he was the president, known as the Commercial Color Type Company. The business of this company consisted of general commercial and photo engraving, publishing "local view post cards," advertising post cards, other advertising, and pictorial posters to "be hung up in workshops to educate employees along the lines of the fundamental principles of life and business." In the spring of 1917, according to the testimony of Mather, which is not contradicted, the business of the local view cards "got very dull" and after he notified three of his salesmen, Fox, Rhodes and Bartlett, who had been selling "local view post cards," "that he did not see how he could profitably keep them on the road longer," they "started out to get other jobs." Through an advertisement in a newspaper they entered the employ of appellee, Stevens-Davis Company, as salesmen to sell pay envelope cards of an "inspirational and educational" character to employers, principally manufacturing companies, to be distributed to their employees through the weekly pay envelopes of the employees. The evidence shows that Fox, Rhodes and Bartlett explained the nature of the pay envelope card business to Mather and that he organized the company of Mather & Company, appellant, for the purpose of engaging in a similar business. Fox, Rhodes, and Bartlett left the employ of appellee, Stevens-Davis Company, and returned to the employ of appellant Mather & Company as sales-

men. It is contended by counsel for appellants that Fox, Rhodes and Bartlett induced Mather to organize the company of Mather & Company and engage in·the pay envelope card business; but counsel for appellee maintain that Mather originated the idea of forming the company and induced Fox, Rhodes and Bartlett to leave appellee, Stevens-Davis Company, and join in business with appellant Mather & Company. In our opinion this question is immaterial. The acts complained of certainly do not amount to unfair competition. If any wrong was committed it was a tort for wrongfully enticing away the employees of an employer. But we do not find from the evidence that appellant is guilty of any actionable wrong. The evidence shows that a number of salesmen worked first for appellants and then for appellee, and that also some worked first for appellee and afterwards for appellants. In doing this they were exercising a perfectly legal right. They also had the unquestionable right to leave either company and engage in a competitive business. *Handel Co. v. Jefferson Glass Co.,* 265 Fed. 286; *Proctor & Collier Co. v. Mahin,* 93 Fed. 875; *Hitchman Coal & Coke Co. v. Mitchell,* 245 U. S. 229. It is not contended that the services of these salesmen were contractual and of such a special, unique or extraordinary nature as to justify relief by injunction. *Cort v. Lassard & Lucifer,* 18 Ore. ·221; *Burney v. Ryle & Co.,* 91 Ga. 701. And even if there were allegations and proof to this effect, relief could not be granted on the ground of unfair competition. Counsel for appellee assert that when the salesmen entered the employ of appellee they brought with them information, copies of papers, documents, and also "trade secrets" of the business of appellee. The alleged "trade secrets" of appellee, as far as we can gather from the evidence, consisted of samples of pay envelope cards called "Success Talks," copies of instructions to salesmen, called "Sales Talks," lists of

customers, routes for salesmen, and generally the details of the nature of the pay envelope card business. Such information in our opinion does not come within the definition of "trade secrets." It is not "a plan or process, tool, mechanism or compound, known only to its owner and those of his employees to whom it is necessary to confide it." (22 Cyc. 842.) The information in question merely related to the general principles of conducting a business. There was nothing secret about the cards called "Success Talks" as they were to be sold on the market to anybody who would purchase them. The other information could not possibly be said to constitute "trade secrets" as understood in a legal sense. Furthermore, even if the information was, in law, of a secret nature, the divulging of it to appellants did not constitute unfair competition. If appellee was entitled to equitable relief in this respect it would be based on another ground than unfair competition. The acts of appellants obviously do not come within the "palming off" rule and that is the test that we have adopted as the rule of law in the case at bar. Counsel for appellee admit the right of an employee to use the experience and knowledge he acquires in one business in any other business in which he may engage but maintain that such knowledge, particularly the "Sales Talks," should not be used for "educating new salesmen." This distinction in our opinion is wholly immaterial.

It is further contended by counsel for appellee that after the filing of the bill in the present case employees of appellants obtained secret information of appellee which was contained in a report of a convention of salesmen of appellee held in Chicago in December, 1920. The report was called "Howls from the First Convention of Order Hounds" and consists principally of an exchange of experiences and views of appellee's salesmen. It is also contended that employees of appellants attempted to entice

away salesmen of appellee who were attending the convention. In our opinion none of these acts constitutes unfair competition. The views we have expressed in regard to similar contentions cover the objections in question.

Counsel for appellee further maintain that appellants "deliberately stole the principles, system and details" of appellee; that they plagiarized the fifty-two topics of the cards "Success Talks" varying the language somewhat; copied the same sequence of subjects; imitated the tints of colors of the cards, their size, their marginal ruling, their thickness, the quality of paper—all to such an extent that the cards of appellants and appellee are "nearly identical." It is further contended that appellants copied the "Sales Talks" of appellee, the color and size of a portfolio used for the cards "Success Talks," and the forms of order blanks of appellee.

We shall consider first the question whether the topics or subjects of the cards of appellants and appellee are written in the same or substantially the same language? As counsel for appellee disclaim that appellee is proceeding on any theory of infringement of copyright, the inquiry will relate only to the question of the alleged similarity of language of the two sets of cards. The cards of appellants were written by Edward J. Shay, a writer who had been employed by Elbert Hubbard and had been associated with the Roycrofters for eight or nine years. He was paid $500. He is now in the employ of appellants at an annual salary of $10,000 "with a possible bonus of $2,500." The original exhibits of the cards have been filed in this court. They are contained in a portfolio, the cards pasted in being appellee's and the ones attached appellants'. The subjects of the cards consist of what are called the fundamental virtues and kindred topics such as Loyalty, Honesty, Temperance. It is only necessary to state, without any argument, or

74    APPELLATE COURTS OF ILLINOIS.

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

reference to essays or standard works, that appellee has no exclusive right to such familiar subjects. Stevens testified, however, that his "thought is orig-inal." It may be true that it appears to him to be "original" as he further testified that he had read only three books in his life and that the cards were written from his "experience and observation." Yet the first card of appellee, which is one on "Opportunity," begins thus: "That intangible and mysterious thing called opportunity about which so *many essays* have been written *so many sermons preached* and *so many poems* inspired." As a matter of fact the thought of appellee is not original. Furthermore, the language or phraseology of the two sets of cards is not similar. We have read and compared the cards of appellants and appellee contained in the portfolio with the exception of two that are missing, and we are of the opinion that there is a material difference in the phraseology, the ideas and the illustrations. Furthermore, fourteen of the titles of appellants' cards are different from those of appellee. We shall quote from several of the cards on corresponding subjects in order that the difference may be seen. The card of appellee entitled "Procrastination" is in part, as follows: "Those infernal thought waves of procrastination are mental 'bugs' that have a brilliant headlight in front and a long sharp 'stinger' behind. They breed by the millions with a little encouragement. * * *" The card of appellants which is supposed to correspond to "Procrastination" is entitled "Never Say 'Wait A Minute'" and is, in part, as follows: "Of all Habits that will destroy your ability to help others or to help yourself the 'Wait A Minute Habit' is the worst." The card of appellee entitled "Hope" is, in part, as follows: "That eternal sunshine which brightens the path ahead— that guide of all ages which bids us look upward above the din of today—* * * that bright ray which

illumines the darkest passages of life's journey * * *.'' The card of appellants corresponding to this is entitled ''Hope Is The Sugar That Sweetens Life'' and is, in part, as follows: ''Was today a Bad day? Well—Hope for a better Tomorrow! Are things going Wrong? Are events Topsy-Turvy? * * *'' Counsel for appellee admit that appellants have ''changed the subject-matter of'' their cards ''just enough to avoid prosecution'' for violation of the Copyright Act. We are of the opinion that they have changed the ''subject-matter'' so materially that the cards cannot be mistaken for each other in respect of phraseology, at least, by even the most casual observer.

On the hearing an issue was made as to whether Stevens, the president of appellee, Stevens-Davis Company, wrote the cards, and a number of witnesses testified on this subject. Both counsel for appellants and counsel for appellee have argued the question at some length in their briefs, but in our opinion it is wholly irrelevant and immaterial. Appellee is apparently the owner of the copyright of its cards, and it makes no difference whether Stevens wrote the cards or whether they were written by someone else. In the opinion of Professor Linn of the Chicago university, who testified for appellants, the cards of appellee possess no literary excellence whatever. He stated that there are three types of errors which appear steadily throughout the cards,—errors of grammar, confusion of thought and mixed figures of speech, and that ''there is a mixture of figures to such an extent'' that to him ''they constitute an absurdity.'' In regard to Stevens' claim of original authorship of the cards without any books as guides to assist him, there is an incident that affects his credibility as a witness. Counsel for appellants showed by two enrollment cards of the Sheldon School of Salesmanship that one Roderick G. Stevens was

enrolled at the Sheldon school. The name is the same as Stevens,' and he did not deny that the name was his. Furthermore, the rule is that, until the contrary is shown, the identity of the name raises the presumption of the identity of the person. Abbott's Proof of Facts, p. 556, 3rd Ed.; Reynolds' Trial Evidence, p. 172. In explanation of the enrollment cards, Stevens testified that he himself did not attend the school but that he "bought the book" for an employee of his named Granahan. It is not easy to understand why an enrollment in the name of Stevens was necessary in order to "buy the book" for Granahan, and it is difficult to perceive why an enrollment of Stevens as a student was necessary at all to "buy a book." Another improbability in Stevens' testimony that he wrote the cards without assistance from any books of reference is that anyone who would not avail himself of such books would be culpably negligent. In this connection there is also significance in the fact that the bill of complaint alleges that appellee, Stevens-Davis Company, is engaged in "inspirational and educational work" and that Orison Swett Marden's book entitled "Architects of Fate or Steps to Success and Power," published in 1897, says in the preface that the "keynote" of the book is "Inspiration to character building"; and the title states that the book is designed to "inspire youth to character building." Some of the subjects discussed in Marden's book are the following: "Success under Difficulties," "Dare," "Clear Grit," "Self-Help," "Opportunities Where You Are," and "The Curse of Idleness." Counsel for appellee say in their brief that Marden's book has not the master's mark upon it. That is true, but the book has been sent to this court as an original exhibit, has been discussed by both counsel, and when it was referred to on the hearing before the master, the master in effect said that the book need not be actually produced. In this situation of the record we think the book may be treated as in evidence.

Considered as to their physical appearance, there is a general resemblance between the cards of appellants and those of appellee.  But there are differences that are so apparent that they could be noticed by an ordinary purchaser.  This is true as to the cards of appellants which were first produced and sold, and particularly true as to the cards sold by appellants after the preliminary injunction.  The subjects on the cards of appellants are printed in large gilt type and are inset on the left top corner of the cards.  Each sentence is paragraphed.  At the bottom of each card on the front side there are the following words and numerals: "Copr. G. C. Mather 1917."  The cards of appellants are tinted in different colors from those of appellee and the colors of the cards of appellants on the same subjects as those of appellee are different.  The styles of the borders are similar.  The cards of appellee have fewer paragraphs, some of them being printed almost solid.  The subject is not indented on the cards but is in the body of the cards.  At the bottom of the cards there is a "C" and the numeral "1916."  The size of the two sets of cards is substantially the same.  This must necessarily be so as they are to be put in standard pay envelopes.  It is probably a fair inference from the evidence, although it is denied by some of the witnesses, that appellants used the cards of appellee as guides in writing their cards, but that is not, in itself, unfair competition.  In the "system," "plan," "scheme" or "service" by which the cards are sold appellee has no proprietary right.  *Hughes v. West Pub. Co.*, 225 Ill. App. 58; *Haskins v. Ryan*, 71 N. J. Eq. 575; *Helfi Co. v. Silvex Co.*, 274 Fed. 653; *Bristol v. Equitable Life Assur. Society*, 52 Hun (N. Y.) 161, 5 N. Y. Supp. 131.  The name "Success Talks" was never printed on or attached to the cards of appellee and, therefore, appellee acquired no right in those words as a trade-mark.  *DeLong Hook & Eye Co. v. Hump Hairpin Mfg. Co.*,

78      APPELLATE COURTS OF ILLINOIS.

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

297 Ill. 359, 364, and the cases cited therein. In fact counsel for appellee do not claim any violation of a trade-mark. The mere adoption and use of words in advertisements, circulars and price lists and on signs and stationery give no exclusive right to their use. *DeLong Hook & Eye Co. v. Hump Hairpin Mfg. Co.*, *supra*. The declaration alone of a person, however long and however extensively published, that he claims property in a word as his trade-mark, cannot make it his property. *Candee, Swan & Co. v. Deere & Co.*, 54 Ill. 439. In this case, the purchasers of the cards are not of the ordinary kind or of only average intelligence and observation. The cards are bought for employers principally by purchasing agents and executives of large manufacturing enterprises. The cards are not sold by appellants by displaying them in stores for the public to buy, but are sold by salesmen to individual purchasers. The general rule is that where ordinary attention will enable purchasers to discriminate between the goods or articles sold by different parties, a court of equity will not interfere. *DeLong Hook & Eye Co. v. Hump Hairpin Mfg. Co.*, 297 Ill. 359, 371, 372; *Ball v. Siegel*, 116 Ill. 137; *Elgin Butter Co. v. Elgin Creamery Co.*, 155 Ill. 127.

"It is presumed that the public uses its senses and takes note of differences which are thus disclosed." 38 Cyc. 790. But, as we have stated, the prospective purchasers of the cards of appellants are not ordinary purchasers but are purchasers above the average, and this is a fact to be considered.

In *Hazelton Boiler Co. v. Hazelton Tripod Boiler Co.*, 142 Ill. 494, the court said (p. 508): "Neither puts its steam boilers on the market to be sold *by retailers or middle-men* to the final purchaser, but both deal *directly* with customers who purchase boilers for their own use, and who give their orders directly to the complainant or defendant as the case may be. In this way the liability of intending purchasers to be

deceived into mistaking boilers of the defendant's manufacture for those of the complainant, if not wholly obviated, is reduced to the minimum.''

In *Harvey Hubbell, Inc. v. General Electric Co.*, 262 Fed. 155, the court laid stress on the fact that the articles were sold largely to jobbers and men who are familiar with the trade.

In the case of *Borthwick v. Evening Post*, L. R. 37 Ch. Div. 449, 461, in considering the similarity of the names ''Morning Post'' and ''Evening Post,'' the difference between articles which are bought by the public generally and those which are bought by more discriminative purchasers was referred to as follows: ''This is very unlike the sale of articles such as tea, or anything else where the articles are bought by the public, who take one particular word of a distinctive name, and are caught by the similarity in the type and by a similarity in the size or colour of the packages; because the representations assumed to be made will only be to those who are going to buy, who will read the paper and will not only take one hasty look at it. * * * They are persons of rather more intelligence, and are not likely to be misled by the colour or imitation of name as purchasers might be of packets, such as of tea, soap, or anything else.''

Counsel for appellee say in their brief that: ''The case at bar must be approached from the point of view of the average overworked business man always in a hurry, or, as the courts have designated such a person, 'the unwary purchaser.' '' We know of no courts that have designated the ''overworked business man'' as ''the unwary purchaser'' and we are unable to find any mentioned by counsel. They cite the case of *Cauffman v. Schuler*, 123 Fed. 205, 206, as using the phrase ''the unwary, the uncautious, or the ignorant purchaser'' but it is not applied to ''the overworked business man.''

Counsel for appellee further contend that although the appellee may have no exclusive right in the word "Success," the word has acquired a secondary meaning among the trade in connection with the established reputation of the service of appellee's "Success Talks"; and that the name "Steps to Success" used by appellants to designate their cards is so similar that it will deceive and mislead purchasers into believing that the cards of appellants are those of appellee. Stevens testified that appellee has an established reputation; and that it began the pay envelope card business in 1914, although Seiders, his one-time sales manager, says it was begun in the first part of 1916. The burden of proving the secondary meaning of the word "Success" is upon appellee and "must be sustained by *substantial* evidence sufficient to show that the use of the word by appellant will result in passing off its goods as the manufacture" of appellee. *DeLong Hook & Eye Co. v. Hump Hairpin Mfg. Co.,* 297 Ill. 359, 369. We are unable to find any substantial evidence that among the trade or the public generally the word "Success" has acquired the secondary meaning contended for by counsel for appellee. On the contrary, several of the purchasers of appellee's card service testified that they did not know the name of appellee, Stevens-Davis Company, the firm they were dealing with, and that they did not know that the service of appellee was designated by the name "Success Talks." Feustman, vice president of the Worthington Pump Company, whose *branch company, the Snow Holly Works Company, was using appellee Stevens-Davis Company's card service,* did not know that the "Success Talks" were manufactured and sold by appellee Stevens-Davis Company. Furthermore, he did not associate the name "Success Talks" with the card service of any particular company. Amundson, purchasing agent for the "Fred C. Arner" company, testified that their company was using the cards of

appellee but that he did not remember the name of appellee; that he had "absolutely forgotten" it; that the salesmen of appellant Mather & Company may have introduced themselves as being with Mather & Company but that the name "Mather & Company" "did not mean any more" to him than "Stevens-Davis Company" did. If the name of appellee, Stevens-Davis Company, was well established in the trade, as is maintained by appellee, and if the name "Success" in connection with its cards called "Success Talks" had acquired a secondary meaning which associated the name "Success" with its cards, it seems strange that appellee's customers did not know its name or the name of its cards.

There was also testimony by Shay, who had been employed by Elbert Hubbard and associated with the Roycrofters for eight or nine years in a somewhat similar line of work as appellee, that he had never heard of Stevens prior to the time that he (Shay) wrote the cards for appellants. McDowell, secretary of the Sheldon School of Salesmanship, testified that he had never heard of Stevens. Furthermore, appellee is not entitled to the exclusive right of the word "Success" in connection with the name "Success Talks" since the evidence shows a prior use of the word as part of the name of Marden's book published in 1897 under the title "Architects of Fate or Steps to Success and Power." It would appear that appellants took the name "Steps to Success" from Marden rather than from the name "Success Talks" of appellee.

In the case of *Yellow Cab Co. v. Ensler,* 214 Ill. App. 607, it was held that the Yellow Cab Company had not acquired a trade-mark in the Y-shaped figure in a circle as a monogram, although registered with the Secretary of State of Illinois as a valid trade-mark, for the reason that such monogram had prior to its adoption by the cab company been adopted substan-

82 APPELLATE COURTS OF ILLINOIS.

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

tially as the insignia of the City of Chicago; and that it was immaterial whether the ordinance adopting the device by the city was valid or not.

In *Nestor Johnson Mfg. Co. v. Alfred Johnson Skate Co.*, 229 Ill. App. 549, it was held that the word "Johnson" in connection with the manufacture of skates by appellee, Nestor Johnson Company, had not acquired a secondary meaning for the reason that there was a prior use of the word in connection with the manufacture of skates by another manufacturer named "John S. Johnson."

It may be further observed that the idea or scheme of pay envelope cards was not entirely original with appellee. It had been used by employers before the service was organized by appellee. It may be that the cards of some of the employers were not sold on the market but were used only by the employers. The Factory magazine, however, advertised pay envelope cards as early as 1913. The New York Central Railroad Company sent out Elbert Hubbard's message to Garcia to its employees in 1898, and the Chicago & Northwestern Railroad Company used pay envelope inserts before appellee.

Hawkinson, the superintendent of George Cutter Company, testified that before that company used the service of appellee he had collected a "lot of similar things" himself that he had "figured on using."

The argument of counsel for appellee seems to imply that appellee occupied the field alone for a considerable time. The evidence does not support this contention. It is said by counsel for appellee that the evidence shows that none of the competing companies and none of the companies that used the idea only for their employees adopted the card system; that the inserts were in the nature of folders. There is evidence that "The Efficiency Service" and the Weis Company used pay envelope cards after the service was started by appellee and that the Chicago and

Northwestern Railroad Company put inserts in the envelopes of their employees before appellee began the business. But the fact is that the evidence shows that the idea of sending messages to employees through pay envelopes was not original with appellee. Seiders, a former sales manager for Stevens-Davis Company, testified that there was competition in the pay envelope card business; that in the latter part of 1916 he told Stevens of the Pope Manufacturing Company, the Kelly Springfield Tire Company, the Eastman Kodak Company, the Atlantic Refining Company, and others. Stevens admits in his testimony that there now are other companies in the pay envelope card business but he states that they are "imitators" of him. He says that Frank Crane is one of the "imitators."

It appears from a consideration of this case that Stevens imagined that he had discovered a new idea in the pay envelope service and that he felt that appellee had an exclusive right to everything connected with the service. It is even contended that appellants wrongfully imitated a blue portfolio used by salesman of appellee for carrying the cards. The evidence shows that a similar portfolio can be purchased in the market at a stationery store and that the idea of using the portfolio was called to the attention of Stevens by either Hames or Bartlett. The matter is so trivial, however, that it is hardly worthy of notice. The observation made by the court in the case of *Helfi Co. v. Silvex Co.*, 274 Fed. 653, is applicable to the present case. "We frequently have had occasion to observe," said the court, "that whenever any one has a special make of anything for which he has created a market, or whenever he is the first to discover or occupy a new commercial field, there is a proneness to set up an *exclusive* proprietorship in such specialty and to the field thus occupied." Apparently Stevens resents any intrusion into what he considers his exclusive domain.

It is further contended by counsel for appellee that appellants have "copied or plagiarized" the "Sales Talks" of appellee which it is asserted were written by Stevens. The evidence shows a dispute over the question of authorship, but not in relation to any infringement of copyright. It is asserted, however, by appellee that the "Sales Talks" are original and that they were wrongfully "copied or plagiarized" by appellants, and "used for the education of new and inexperienced men." It is rather difficult to understand the force of this objection, since counsel for appellee concede that they are not proceeding under any claim of copyright. Moreover, as the "Sales Talks" were not sold on the market but were used only by salesmen of appellee, no question of unfair competition could arise. In this situation, even if they were bodily appropriated by appellants, no legal wrong would be committed which could be redressed in this proceeding. Apparently, however, there seems to be some vague claim of exclusive right because Stevens testified that he wrote them as original productions from his "experience and observation" without consulting any books on salesmanship. As a matter of fact they are not original and appellants did not copy or "plagiarize" them. The "Sales Talks" of appellants were written in the same way that appellee's were written, and that is by using books on salesmanship as references and guides.

A witness for appellants named Carey, a graduate of Yale and other institutions, testified that he wrote the "Sales Talks" for appellant Mather & Company; that he had never seen the "Sales Talks" of appellee before he wrote the "Sales Talks" for appellant Mather & Company, but that he wrote them after he had "done a good deal of reading" of the various authors on the principles of salesmanship. He also testified that at the time that he was employed as sales manager for a company named the Dodge Com-

pany located in New York he "was quite a genius, or was supposed to be." Stevens testified that he "never read anybody's course on salesmanship." Yet he also testified that he was "the leading authority" on salesmanship in the United States. He said: "Without throwing any bouquets, I think that I can say I am considered the leading, if not one of the leading—one of the leading if not the leading authority on salesmanship in the United States." There is a letter in evidence, however, from Shay to Mather in which Shay refers to certain "Sales Talks" that he is revising for appellants. Whether they are the "Sales Talks" that Carey wrote for appellants, or the "Sales Talks" that Stevens claims to have written for appellee does not appear from the evidence. The letter was obtained by a man named Nelson who was paid by Stevens to enter the employ of appellants over a year before the present suit was filed to get information concerning the business of appellants. In this letter Shay does not seem to consider the "Sales Talks" of much merit in the form in which he received them. Shay says: "Before me, as I write this letter, are five batches of 'Instructions for salesmen.' I have been reading them for three days, and I have an ache in the front of my head and in the back of my head and both sides. The trouble with all of them (and there's absolutely no question about it) they're too gol darn long. Any salesman who would attempt to memorize them would be an idiot and any salesman who succeeded in memorizing them would be a D. F. I have cut down these sales instructions as much as I thought I dare, but even so, if the proposition was mine, I'd cut it down again. * * * In shaping this stuff, I tried to put some order into chaos. After reading all the talks I selected the one that appeals to me as the best."

The evidence shows that the principles of salesmanship may be found in many standard books, and

that there is very little new thought that can be contributed to the subject. The series of fifty-two "Talks on Salesmanship" by appellee contain only the fundamental principles and ideas of general scientific salesmanship which have been treated in numerous standard works. There is nothing particularly new or original in them. Some of the ideas and principles may be expressed in a little different form, but that is about all that distinguishes them from the ordinary rules of salesmanship.

There is in this court, as an original exhibit, the work of. W. C. Holman, in two volumes, copyrighted 1907, entitled "Talking Points and Selling Arguments," being "Six Hundred Answers to Objections that Salesmen Commonly Meet in Selling Goods." Counsel for appellee state that "Vol. 1" "bears no mark of the master and is not in evidence"; and that "Vol. II" is "in evidence as to the title page only." The statement of counsel is not entirely accurate. The copyright "1907" is in evidence; and although "Vol. I" is not marked by the master, the record shows the following offer by counsel for appellants: "I also offer in evidence under the word 'contents' in Vol. 1, objections No. 1 to 97, which I will copy out of this book and hand to the master, the same being as follows." The master said, "The reporter will copy it in the record." Then follow on five pages of the record the titles of 97 objections. The record shows a further offer: "I offer in evidence the contents of Vol. 2, objections Nos. 98 to 200"; and the master added, "The same being as follows." Then follow on six pages of the record the titles of 103 objections. The titles of the topics which are set out in the record are amply sufficient in themselves to show that Holman's book is based on the fundamental principles of salesmanship. Some of the titles are as follows: "Your price is too high"; "I can get along without it"; "I will wait awhile"; "Can't see you today";

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

"It is easy to get testimonials. I don't want to read yours"; "Your goods don't appeal to my trade."

Another book in evidence as an original exhibit is "Scientific Salesmanship," by Carl Horton Pierce, published in 1906. From a comparison of this book with the "Sales Talks" of appellee, one might be led to believe that parts of it were referred to by Stevens or whoever wrote the "Sales Talks" of appellee, in the compilation of his "Sales Talks." Some of the subjects treated are as follows: "The Pre-Approach." "The Approach." "The Demonstration." "Closing Points that win Checks." "Getting the Check" and "The Harvest." Under these various topics the principles of salesmanship are discussed. For example, under "The Approach," the salesman is told such things as how to introduce himself and how to proceed at the first interview. He is told, "Don't be sidetracked." He is also told what to do "in the first five minutes." Counsel for appellee contend that Pierce's book does not say "Don't present your card to gain admission." It does not use that identical language but on page 31 it says: "We do not advise salesmen to introduce themselves by sending in a card." Other directions are as follows: "Don't fail to hold the prospect's interest while calling attention to good points." "Don't allow the prospect to examine the catalogue at length." "Don't be too blunt." "Don't talk him out of it." "Don't put the register in on trial." "Never allow a prospect to lead and shape the argument." There is a heading entitled: "Demonstration Don'ts," in which fifty "Don'ts" are enumerated. The salesman is also told that if he cannot make his demonstration immediately following the first interview with the prospect, "he *must warm him up* again." Some of the objections that must be met are as follows: "Your machine costs too much." "I am satisfied it won't change." "No demand for the article."

In the "Sales Talks" of appellee there are "Objections and Answers," and there is a list of "Don'ts." Some of the "Don'ts" are as follows: "Don't use cards to secure entrance." "Don't show letters of service unless you have *warmed up* prospect with the spirit of the proposition." "Don't continue to show service if prospect skips over letters and will not really look at them for the good he may secure." "Don't allow prospect to read to himself all or any part of the testimonials." "Don't leave contracts to be signed." "Take the order with you on first interview." The "Approach" is also discussed.

Some of the subjects that may be found in the "Sales Talks" of appellee are as follows: "I haven't time to go into this now." "I don't think we need it." "I will try for a limited period." "Mastering the situation." "Not ready to buy." "Your price is too high." "Getting by the office boy."

In Pierce's book the text is frequently illustrated and emphasized by short stories, anecdotes and experiences of salesmen. Examples of these are as follows: "Lost! A Wagon." "Four Years' Profits Gone." "Painted a picture for his prospect." "Story of the Comet." "An Umbrella will not keep off the rain but it is a good thing to have in a storm." Appellee's "Sales Talks" also contain illustrations and stories which the salesmen are directed to use. For example: "Where prospect does not pick out letter, take up letter No. 4 and shoot Grinden-Martin story. Then letter No. 39 and tell him Meyer Bros. story. Then letter No. 1 and give him Badger Candy Story."

Appellants' "Sales Talks for Common Sense Business Talks" proceed along the same lines as those of Holman, Pierce and appellee. Some of the objections are as follows: "You want too much money for the cards." "We have been getting along without it for a good many years." "We will try it for three months." "Securing the Interview." There are also

a series of "Nevers." Some of them are as follows: "Never use a card for obtaining entrance." "Never endeavor to sell any person but the right man." "Never expect to leave an order by leaving a contract." "Never leave talks."

We think that on a fair comparison of all these "Sales Talks" the principles are the same, and, in some instances, the language is substantially the same. It will be noted that Holman's book and Pierce's book antedate appellee's "Sales Talks" by many years.

Seiders testified that he wrote the original "Sales Talks" for appellee; that he got the idea of the "Don'ts" from Pierce's book on "Scientific Salesmanship" and Hawkinson's book on salesmanship, and the other ideas from "600 Talking Points and Selling Arguments," by Holman. Seiders further testified that he lent Hoyt's book on salesmanship to Stevens. After a comparison of appellee's "Sales Talks" with Pierce's book and Holman's book we are of the opinion that Seiders has testified correctly. If Seiders did not write them, whoever did write them evidently used the books of Pierce and Holman as references.

It is contended by counsel for appellee that the method by which appellants obtained recommendations or "testimonials" of their service violated the rule of unfair competition. When appellants first began their business some of the employees who were formerly with Mather's Commercial Color Type Company were working for appellee, Stevens-Davis Company. They left appellee and went to work for appellant Mather & Company. Through these employees Mather obtained a list of the customers of appellee and wrote a letter to about 200 of them asking them what they thought of the pay envelope card "proposition." The pertinent part of the letter is as follows: "We understand that you are using the series of 'Success Talks' or 'Common Sense Business

90    APPELLATE COURTS OF ILLINOIS.

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

Talks' printed on small cards for weekly distribution to your employees through the medium of the pay envelope, *and as we are considering this ourselves,* we will appreciate it very much if you will have the kindness to advise us just what you think of the proposition.'' The letter is signed: ''Mather & Company.'' Some of the replies were commendatory, others were not. About twenty-five were selected for use by Mather & Company. There is testimony by some of the writers of the testimonials that they were under the impression from the letter that appellant Mather & Company, were contemplating using the service among their own employees, and that they did not think that Mather & Company were in the business of selling the cards. Such an impression was a natural one in the circumstances. Mather testified that the testimonials were not to be represented by salesmen of appellant Mather & Company as recommendations of the cards of that company but that the testimonials were to be referred to as commending the ''system,'' ''plan'' or ''scheme.'' Mather also testified that the testimonials given to the salesmen were stamped with a rubber stamp as follows: ''This is a reproduction of reply to an inquiry concerning a service similar to our 'Steps of Success.' Mather & Company.'' Counsel for appellee assert that the testimonials were not so stamped when appellants first began to use them. There is testimony on behalf of appellee that testimonials were found in the possession of some of appellants' salesmen without the rubber stamp. Although the matter of the testimonials appears to be one of the chief grievances of appellee and is denounced by counsel for appellee as the ''rankest kind of fraud'' and in the bill of complaint is spoken of as ''dastardly,'' we do not deem it necessary to dwell at length on the question, as in our judgment the conduct of appellants did not constitute unfair competition. We think that the conduct

of appellants was unethical but we are of the opinion that the procuring of the testimonials in a wrongful way did not, of itself alone, violate the rule of unfair competition. In the case of *Hazelton Boiler Co. v. Hazelton Tripod Boiler Co.*, 142 Ill. 494, the court said (p. 509): "The defendant had, to some extent, availed itself of recommendations given to the complainant by its customers commendatory of boilers of the same class manufactured and sold by the complainant. So long as it does not appear that the defendant did this by way of deceiving an intending purchaser into the belief that the boilers in which the defendant was dealing were of complainant's manufacture, we are unable to see that there was anything *legally* improper in all this."

In *Perlberg v. Smith,* 70 N. J. Eq. 638, in discussing unfair competition, the court said (pp. 642, 643): "Care must be taken in these cases not to extend the meaning of the word 'unfair' to cover that which may be unethical but is not illegal. * * * What conduct on the part of a defendant will be held to constitute unfair competition is the subject-matter of discussion in cases too numerous for useful citation, but the principle applied in each case is extremely simple. As Lord-Chancellor Halsbury said * * *: 'For myself I believe the principle of law may be very plainly stated, and that is that nobody has any right to represent his goods as the goods of somebody else.'" The record shows that on the hearing of the present case counsel for appellee admitted that appellee had no "special instances" where salesmen of appellants stated that the testimonials were testimonials of the service of appellants. The admission was made in the course of the examination of the witness George A. Petit. He and Rhodes were traveling together as salesmen for appellants for six or seven weeks. Petit was asked if Rhodes ever stated in his presence that these testimonials were testimonials of appellants.

Counsel for appellee objected, and the master said: "They must show the instances where they represented to * * *." Counsel for appellee answered: "We have no evidence of special instances where that was done."

Counsel for appellee maintain that in several specific instances the salesmen of appellants sold appellants' cards as those of appellee. If that is true, such acts come within the rule of unfair competition. We shall examine the facts relating to these transactions.

The sale of appellants' cards by Rhodes, a salesman of appellants, to Feustman, vice president of the Worthington Pump Company, is a transaction which counsel for appellee contend is an instance of unfair competition. Feustman was the only witness in this matter. Rhodes could not be found. Several registered letters were mailed to him but he did not answer.

Feustman's testimony was given by deposition before a notary and was not taken before the master. The findings of the master, therefore, in regard to Feustman's testimony, do not have, in their support, the advantage that may be derived from seeing and observing the witness as he testified. Feustman was a biased witness, hostile to appellants. It would seem that this state of mind was produced by reason of the fact that appellants had procured one of the "testimonial letters" from the Snow-Holly Works, a branch company of the Worthington Pump Company; also because of a conversation Feustman had with Raisig, an employee of appellee, Stevens-Davis Company; and because of the further fact that Feustman had received a copy of the preliminary injunction and the pamphlet entitled "Evidence of Fraud." Feustman's testimony was given over a year after he purchased the cards. He testified that before he gave his testimony Stevens called on him with his attorney and went over the facts "in a general way." He also testified that before he gave his testimony Raisig,

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

a salesman for appellee, Stevens-Davis Company, had called on him, told him about the "misrepresentation" that appellants "had used," and tried to get him to sue appellants to recover the money that Feustman had paid for the cards of appellants. Feustman further testified that Raisig also told Feustman "a great many things against" appellant Mather & Company and tried to get Feustman to join with appellee in a suit against appellants; and that Raisig "may have said something about going to put Mather & Company out of business." Feustman further stated that Raisig had explained to him the methods by which appellants secured customers, and had asked him if he did not agree with him, Raisig, in condemning the methods. Feustman told Raisig that he thought appellants' methods were "reprehensible" and that he would do "everything reasonable" to place appellee, Stevens-Davis Company, in possession of such information as he had. Notwithstanding this frame of mind, Feustman gave appellant Mather & Company another order for cards months afterwards. Feustman also talked with Mather and "expressed" his "opinions to him of the methods that had been used" by appellants. He also told Mather that if Rhodes had stated frankly the situation he "would probably have gotten the order just the same." Feustman says that "Mather agreed with" him "that some of the things they had done were not entirely without blame."

The weight of the testimony of Feustman is materially weakened by the fact that much of it on material matters was elicited by leading and suggestive questions. In response to leading questions he even expressed opinions on ultimate issues of fact. With the exception of his "impressions," his testimony is, in parts, contradictory, indefinite, and susceptible of different interpretations. It is not clear and convincing. Before reviewing the testimony we shall cite one exam-

ple of a direct, irreconcilable conflict. On cross-examination, Feustman was asked if he did not receive samples of appellee Stevens-Davis cards from the Snow-Holly Works, which company was using those cards, and he replied that he had not. The question was repeated and he again answered that he had not. The question was then put in the following form: "You don't remember of having the samples of cards received by you from the Holly Works, and also the samples of cards as produced by Mr. Rhodes at that time before you gave this order?" He answered, "I don't recollect that. I did not ask for them in my letter to the Holly Works. I simply asked them what results the distribution of these cards had had." His attention was directed to the letter from the Snow-Holly Works to him, and particularly to the last line of the letter which reads as follows: "We are enclosing a few samples herewith." He was then asked the following question: "Do you still want to say you did not receive any samples?" He answered: "I want to say that I do not recollect having seen them. Possibly they were attached to the letter." By these questions and answers Feustman is as positively and unmistakably committed to the statement that he does not recollect having seen the samples sent to him by the Snow-Holly Works as it is possible for anyone to be. On redirect examination, however, he makes a surprising answer to the following leading question: "You stated, Mr. Feustman, that you made no complaint relative to the nature of the cards, in response to a question asked you by counsel. I would like to know whether *you noticed any difference between the samples sent down to you by the Snow-Holly Works* of the cards they had been using, *and the cards* which were presented to you by Mr. Rhodes in making the sale?" He answered: *"I thought they were similar cards."* How was it possible for him to "think" that the samples of the cards of the Snow-Holly Works

"were similar" to the cards shown to him by Rhodes when he had first testified several times that he had not received any samples from the Snow-Holly Works, and then, after he was shown their letter, that he did not "recollect having seen them?" His answer to the leading question shows at least his susceptibility to suggestion.

The question involved in the sale of the cards to Feustman relates to the use of the "testimonial letters." One of these letters was obtained by appellant Mather & Company from the Snow-Holly Works, which, as has been stated, is a branch of the Worthington Pump Company. The purchase of the cards by Feustman was not made hurriedly but deliberately. He did not give the order for the cards on the first interview he had with Rhodes, but only after at least two interviews. He did not accept the statements of Rhodes without investigation. Before he signed the order for the cards he wrote to the Snow-Holly Works and to appellant Mather & Company in regard to representations made by Rhodes, and received replies from both of those companies. Feustman testified that he was under the "impression" when he purchased the cards that he was buying the "Success Talks." He does not state that he was under the impression that he was buying the cards of appellee, Stevens-Davis Company, and he could not have so testified because the evidence shows that he did not know the "Success Talks" were sold by appellee, Stevens-Davis Company. He did not know that the names "Steps to Success" and "Common Sense Business Talks" denoted different cards from "Success Talks." The Snow-Holly Works, a branch of the Worthington Pump Company, of which Feustman is vice president, was using the card service of appellee, Stevens-Davis Company. If Feustman had known that the company which was furnishing the service to the Snow-Holly Works was named Stevens-Davis Company he never

would have got the "impression" that he was buying "Success Talks"; but he did not know that fact at the time that Rhodes called on him, and it seems that he did not become acquainted with it before he bought the cards, even though he corresponded with the Snow-Holly Works about the cards after his first interview with Rhodes. It was because of his ignorance of the fact that there were two companies selling pay envelope cards that he assumed that the different names of the cards and everything connected with the transaction related to the same cards. He testified that when Rhodes first called on him Rhodes showed him a number of "testimonial letters," one of which was from the branch company, the Snow-Holly Works, and said that they were letters that his company had received from "users" of the cards. He testified further that Rhodes said that they were already using the system at their Snow-Holly Works. He also testified that Rhodes spoke of the "plan" of putting cards in pay envelopes; and that Rhodes showed him a large number of photographic reproductions of letters which Rhodes said that "his company had received from former users of these cards." Nowhere in his testimony, so far as we have been able to discover, does Feustman say that Rhodes actually stated in terms that the "testimonial letters" were recommendations of the service of appellant Mather & Company. He only testifies that Rhodes said that they were letters that his company "had received." The testimony of Feustman stands alone. Although there are circumstances in his testimony which would seem to indicate that Rhodes meant that the testimonials *received* by his company related to the general "scheme" or plan of the service, yet as Feustman's testimony is not directly contradicted, and as the statement of Rhodes is equivocal, we are of the opinion that Feustman was justified in drawing the inference that Rhodes intended to convey the impression that

the "testimonial letters" were recommendations of appellants' service. But that does not amount to unfair competition. It is an ambiguous representation susceptible of the interpretation that certain companies had approved appellants' card service. It is fictitious praise or "puffing" of appellants' card service; but it is not a "palming off" or an attempt to "palm off" appellants' card service for that of appellee. The principle is the same as if Rhodes had told Feustman that John Doe had said that appellants' card service was the best on the market, when in fact John Doe had said that appellee's card service was the best on the market. It has been held that it is not "legally" improper for one company to avail itself of the recommendations given to another "so long as it does not appear" that this is done "by way of deceiving an intending purchaser into the belief" that the goods or articles of one are those of another. *Hazelton Boiler Co. v. Hazelton Tripod Boiler Co.*, 142 Ill. 494. The representation by Rhodes that the "testimonial letters" were letters that "his company *had received* from former users of these cards," while literally true, was uncandid in the circumstances, and, as a matter of business ethics, was highly improper.

Feustman testified that he did not buy the cards at the first interview because he wanted "to write to the Snow-Holly Works and find out whether or not they had worked." He wrote to the Snow-Holly Works and stated that Rhodes mentioned that company, among others, as using the "scheme." He also wrote to appellant Mather & Company referring to the "plan" and asking for a list of some of the other larger manufacturers or companies who have used the service, stating with what result. He received a letter from appellant Mather & Company signed by Rhodes, which speaks of the printed talks "Steps to Success," which are being sent "as per

conversation that the writer had with you." Appellant Mather & Company also sent Feustman a list of companies purporting to be "users" of appellants' service. The Snow-Holly Works also replied to Feustman, inclosing samples of the cards they were using, namely, the cards of appellee, Stevens-Davis Company.

Feustman testified that he was under the "impression" that the cards he bought from Rhodes were the same as those the Snow-Holly Works were using. Yet he is wholly unable to state one single tangible thing, besides the representation in regard to the testimonial letters, that Rhodes did or said that would justify such an "impression"; and he had at least two interviews with Rhodes before he gave the order, the first interview lasting "possibly half an hour." Feustman's testimony, aside from his "impressions," is very unsatisfactory, as much of it on material issues was brought out by leading and suggestive questions. His recollection frequently had to be refreshed. "Impressions" of a witness in the absence of the facts from which they are derived, are not sufficient on which to base fraud; and "the essence of unfair competition is fraud." *DeLong Hook & Eye Co. v. Hump Hairpin Mfg. Co.*, 297 Ill. 359, 371. It is a familiar rule of evidence that fraud is never presumed, but must be clearly proved; and it has been expressly held that the proof necessary to establish unfair competition must be clear. *DeLong Hook & Eye Co. v. Hump Hairpin Mfg. Co., supra; Ball v. Siegel,* 116 Ill. 137, 147. A slight preponderance of the evidence is not sufficient. Objections to the questions and answers involving the "impressions." and "understanding" of the witness were properly made before the notary who took the deposition, but we do not find that the objections were ever passed on by the court. It is a well-known rule of evidence that "impressions" are not admissible. *National Syrup Co. v. Carlson,* 155 Ill. 210, 217. A

witness "cannot be permitted to give a mere conclusion of his own when the conversation or declarations from which the conclusion is drawn have passed from his mind." *Helm v. Cantrell*, 59 Ill. 524, 532. The "impressions" of Feustman are in evidence and must be considered. *Lamb v. Taylor*, 67 Md. 85, 94; *Slingluff v. Andrew Volk Builders' Supply Co.*, 89 Md. 557, 562. However, they are entitled to little probative force. Furthermore, they are not justified by the evidence. Feustman did not rely on the statements of Rhodes. He wrote to appellant Mather & Company and to his branch company, the Snow-Holly Works, after his first interview with Rhodes. It was not necessary for him to assume that the latter were using the same cards that Rhodes was selling. He could have obtained the information when he wrote to them. Moreover, he could have discovered that he was dealing with a different company if he had compared the samples that the Snow-Holly Works sent him with Rhodes' samples. On redirect examination, in answer to a leading question, he says he did, but we have shown by the record that he did not. If, in fact, he did, then he testified falsely in answer to repeated questions on cross-examination. He certainly cannot hold Rhodes responsible for his ignorance of the name of appellee, Stevens-Davis Company, which was furnishing the service to his branch company, the Snow-Holly Works; nor can he hold Rhodes responsible for his carelessness in assuming that the names "Success Talks," "Steps to Success" and "Common Sense Business Talks" related to the same service. Being a business man himself, he should have known that a service would have a fixed name, and would not be known by three different names. Furthermore, he knew he was dealing with appellant Mather & Company, because he wrote to that company to verify what Rhodes had told him, and signed an order for the cards on which was printed the name of Mather &

100 Appellate Courts of Illinois.

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

Company. We hold that in this transaction appellee has not clearly established a case of unfair competition.

It is contended by counsel for appellee that appellants were guilty of unfair competition in the sale of their cards to the Snow-Holly Works, a branch of the Worthington Pump Company. The sale was made to Squires, the office manager, by Rhodes, a salesman of appellants. The testimony of Squires was taken by deposition before a notary and not on the hearing before the master. In order that any one may understand fully Squires' testimony, it will be necessary to read the transcript of his testimony in the record, as the abstract and the additional abstract are inadequate in parts. Much of the testimony was elicited by leading questions, and he was asked to express his "opinions" on ultimate issues in the case. He testified that Stevens, the president of appellee, had called on him some time previous to his (Squires') testimony; told him that there was "some litigation on" and asked him "the circumstances under which" he "placed" his order; that Stevens said "that he did not consider Mather & Company had treated them fairly on the proposition; that Mather & Company were using the letters which he (Squires) had written Mather & Company in reference to their cards as a selling argument in a way—not that exactly, but he (Stevens)" showed a portfolio with letters in it and showed him "how they were used"; that he (Stevens) "was very nice about it"; that Stevens said "there was a loss of business," and that he did not think that was a fair way of doing business"; that the "loss ran up into some thousands"; that Rhodes had left his ` (Stevens') employ; that he (Stevens) "always treated his men fairly, and did not consider they treated him fairly in leaving there." The Snow-Holly Works was one of the companies that had given appellants a "testimonial letter." Squires was irri-

tated with appellants about the way they had obtained
the letter. He testified that they abused his confidence
by putting it in the portfolio and that that was what
he "objected to mostly." This does not appear in
the additional abstract. He also testified that his
company is still using the cards of appellant Mather
& Company. Squires is the only witness to the sale
of the cards, as appellants could not procure the at-
tendance of Rhodes. He would not answer registered
letters sent to him by appellants. Squires testified
that Rhodes never told him that the "testimonial
letters" were recommendations of the service of
appellants. Squires knew that they were not and was
acquainted with the way they were procured, as he
had written one himself. The testimonial letters were
not involved in the sale of the cards to him by Rhodes.
He knew that he was dealing with appellant Mather
& Company, and that Rhodes represented that com-
pany. The principal feature of his testimony is that
he stated that Rhodes told him that appellee, Stevens-
Davis Company, "was practically dissolved"; that
"Mr. Mather had taken over the cards after that."
He repeats this statement several times during his
testimony. It is utterly irreconcilable with other
parts of his testimony, which clearly show the im-
probability of Rhodes ever having made such a state-
ment. On Squires' cross-examination it appears
positively that Rhodes never made such a statement,
but that Squires' testimony that he did is based on an
inference that Squires drew from a remark which he
says that Rhodes made. This part of the testimony
does not appear in the additional abstract and is not
correctly abstracted in the abstract. Squires was
asked this question: "Isn't it a fact that you got this
idea about Stevens & Davis being practically dis-
solved, and that Mather & Company had taken over
the cards, as the result of your conversation with Mr.
Stevens?" He answered: "No, sir; from Mr.

Rhodes because he said *they wanted to get somebody else to write the cards instead of Mr. Stevens.*" After this answer the only question that remains concerning Squires' testimony is whether Squires' inference was justified by Rhodes' remark. We are of the opinion that the inference was wholly unreasonable and illogical and was not one that would ordinarily or probably be drawn from the remark. Squires had previously testified on direct examination that Rhodes had said "they were going to put out a better card and engage somebody in New York to write the sayings on them"; and he had also testified previously on cross-examination that Rhodes had stated that the cards of Mather & Company were of "better material, and they had engaged somebody in New York to write them for them." But it was not until the latter part of his cross-examination that it developed that these remarks of Rhodes constituted the basis of an inference by Squires that Rhodes had said that appellee, Stevens-Davis Company, was practically dissolved and that Mather & Company had taken over the card business. Unless Squires had positively testified that the remark of Rhodes was the basis of the inference, it would almost be unbelievable. Still Squires' logic in this instance is on a par with his method of reasoning in regard to another matter. In order to indicate the improbability of Rhodes having made such a statement, Squires was asked this question: "You knew that could not be so, because you were getting cards every week from Stevens-Davis?" He answered: "That could be so in a way; they could give up the card business and still keep up the impression—still furnish them." It will thus be seen that Squires' logical faculties do not work in the ordinary manner. Independently, however, of Squires' explanation of how he reached the conclusion that Rhodes had stated that Stevens-Davis had dissolved partnership and that Mather & Company had taken

over the card business, the improbability of Rhodes having made the statement is shown by other parts of Squires' testimony. Squires admitted that he and Rhodes compared the cards of appellant Mather & Company and of appellee Stevens-Davis Company; that the Stevens-Davis Company was still sending Squires weekly shipments of cards; and that Rhodes told him that salesmen were leaving the Stevens-Davis Company. If it is admitted that Rhodes made the statement, then these absurd suppositions must be indulged; that the cards of Mather & Company were being compared with a company that had gone out of business; that weekly shipments of cards were being made by a company that no longer existed; and that salesmen were leaving a company that was already out of business.

We are of the opinion that the transaction in question did not constitute unfair competition; and, furthermore, that if Rhodes had stated that appellee had gone out of business it would be a trade slander and not unfair competition.

In the matter of the "Fred C. Arner" Company, two salesmen of appellants, Rhodes and Crowley, called on the official of the company who did the purchasing, named Amundson, and obtained from him an order for appellants' cards. The company at the time was taking the pay envelope card service of appellee, and appellee's contract "had a short period to run." Amundson and Crowley were the witnesses to these transactions. The testimony of both was taken by deposition before a notary and not before the master. Amundson stated that he had received a copy of the pamphlet entitled "Evidence of Fraud." That is the pamphlet that was sent out with a copy of the preliminary injunction by appellee, Stevens-Davis Company, to the customers of appellants. Amundson's testimony is not clear on many material matters. We have read the transcript of his testimony

in the record and have not relied on the abstract or the additional abstract. Rhodes made the sale and not Crowley. Rhodes had been in the employ of appellee and had sold Amundson its cards. Amundson testified that he bought the cards from Rhodes under the "impression" that he was buying the same set of cards he had been using, but another series; that his understanding was based on what Rhodes told him and on that only, and that he thought the thing had been "put over on him," that it "wasn't square." But he also testified that "he wouldn't attempt to say exactly what Rhodes first said to" him when he came into his office soliciting the second order. This testimony does not apear in the additional abstract. Amundson further testified that according to his best recollection he recognized Rhodes as having been in there before and that when he saw his *card* and "Success Talks" cards he, Amundson, did not remember that Rhodes was with another concern on the previous visit. The additional abstract makes Amundson say, "When I saw his pay envelope cards." But from the transcript of the testimony it clearly appears that the "card" referred to by Amundson was Rhodes' business card. Amundson had, in a previous part of his testimony, stated that Rhodes gave him his card. Further on in his testimony, however, he said he didn't know whether Rhodes and Crowley sent in a card or not, but it was quite possible they did. Amundson testified that Rhodes asked him "how they liked the cards" they *"had been using."* In the additional abstract this incorrectly appears as follows: Rhodes said, "we had been using the cards and asked how we liked them." Amundson testified that he and Rhodes talked about the cards and that Rhodes said "the cards *he proposed to furnish were better*—they were improved upon." In the additional abstract this appears as follows: "He said the cards had been improved upon." Amundson

testified that Rhodes had specimens of the cards with him, that the texts of some of the cards were read, and that Rhodes said there was some improvement in the cards. Amundson testified that Rhodes and Crowley may have introduced themselves as being with appellant Mather & Company, *but that Mather & Company didn't mean any more to him than Stevens-Davis did.* He said that Rhodes did not state that he was not with Stevens-Davis Company. He stated that previous to placing the order they talked about the cards they had and wanted another contract. Amundson was asked this question: "Did he say he wanted another contract?" He answer, "I wouldn't say that he put it that way, but he was there after another order." Amundson was also asked this question: "He asked you how you liked the cards?" He answered: "He asked me how we liked the cards we had been using and wanted to know—I cannot say exactly how it was put, but I *gathered or assumed—*." Here the witness was interrupted. Amundson testified that on a second visit Rhodes tried to convince him that he knew what he was buying, but that he told Rhodes he "did not know he was buying a different card." Amundson testified that he "assumed" that the order he gave Rhodes "was placed on a Mather & Company order blank, but that he could not tell now."

There is nothing in Amundson's testimony from which it can be clearly inferred that Rhodes "palmed off" or attempted to "palm off" the cards of appellant Mather & Company for those of appellee, Stevens-Davis Company. Amundson merely "assumed" or was under the "impression" that he was buying the same cards. Rhodes told him the cards he "proposed to furnish" were "better" cards and read the texts from some of the cards to support his assertion. Amundson signed an order blank with the name of Mather & Company on it, but he did not notice the name. He did not even know the name of appellee,

Stevens-Davis Company, whose card service he was receiving. He did not recollect anything clearly. Although a purchasing agent, he failed to exercise ordinary diligence. On the contrary, he was guilty of carelessness. What we have previously said in regard to "impressions" applies to Amundson's testimony.

According to the testimony of Crowley, who was present when Rhodes made the sale to Amundson, there was nothing said by Rhodes that would justify the inference by Amundson that he was buying the same cards he had been using. Crowley says Rhodes announced that he was representing Mather & Company, and explicitly stated his name and Crowley's name. Rhodes introduced Crowley as representing Mather & Company of Chicago. Rhodes said he would like to show Mather & Company's cards if Amundson had the time to look them over. Amundson said he would be glad to do so. Rhodes took out the cards and demonstrated them, comparing them with the other cards. He told Amundson that he would like an order on the merits of the cards absolutely. He left it to him whether they were better or otherwise, and Amundson said they were very much better—better than the other line they had been using. The other line was Stevens-Davis Company's cards. Amundson took a deliberate look at the cards. Crowley says he and Rhodes were there probably twenty minutes to half an hour. Amundson was satisfied and much pleased with the cards and signed the order. Very little was said about the Stevens-Davis Company—only the fact that he, Rhodes, had placed an order formerly with them; that Mather & Company was a new company and he went with them along with several other salesmen, believing he had a more meritorious proposition, and invited Amundson to make a comparison. Neither Rhodes nor Crowley said that it was a continuation of the Stevens-Davis Company's cards, or anything that could lead Amundson to believe that

he was buying the same cards or from the same concern—absolutely nothing. Crowley said he was still working for Mather & Company. He said Rhodes used the order blank; that Rhodes could not have made it more clear to Amundson that the new cards they proposed to sell were the cards of another and different and new company; that Amundson knew that very well.

We are of the opinion that the facts relating to this transaction do not clearly establish a case of unfair competition.

It is further contended by counsel for appellee that the sale of the cards of appellants to the American Electrical Heater Company constituted a case of unfair competition. The sale was made to the cost accountant and head timekeeper of the company named Dressel, by a salesman for appellants named Warner. The testimony of Dressel, Warner and Reutelsterz was taken by deposition before a notary. The master did not have the opportunity of seeing these witnesses testify. The purchasing agent of the company, Reutelsterz, had some correspondence with appellants about the sale based on what Dressel told him, but Reutelsterz was not present when the sale was made and knows nothing about it except from what Dressel said to him. The order for appellant Mather & Company's cards was sent by a mistake of Reutelsterz's stenographer to appellee, Stevens-Davis Company. In a letter Reutelsterz wrote to the latter company he asked if the company was still furnishing the "Success Talks" or whether this end of the business had been "taken over" by Mather & Company. So far as Reutelsterz is concerned, the whole matter rests on Dressel. The principal part of Dressel's testimony as to what Rhodes said to him is as follows: "Well, he stated, the impression I got—of course it is so long ago, I cannot remember—but that they had taken over the business of the Stevens-Davis, and that if we

wanted to continue with taking these cards we would possibly have to take them through them." Dressel is unable to tell how he got the "impression" that appellee, Stevens-Davis Company, had gone out of the card business and that appellant Mather & Company had taken over the business. When he was asked if he had any independent recollection of anything that Warner said in that respect, he did not know what "independent recollection" meant. Apparently he was acting in place of an official who was absent. It was explained to him that what was meant was whether he knew what Rhodes said without looking at Reutelsterz's letter to appellee, Stevens-Davis Company, which contained the inquiry above stated. He answered: "Without seeing that, because the letter says so and so, and I must have heard it, which is I got the *impression* they had taken it over." He was asked this question: "What did he say that gave you that impression? Can you tell us anything on that?" He answered, "Why, no. The *impression* I got was that they had taken over that sort of business from the Stevens-Davis and the Stevens-Davis were not in that line any more." He was again asked this question: "But you cannot tell us anything that was said by him?" He answered, "No, sir." Reutelsterz testified that he got the information from a conversation with Dressel if he "remembered correctly"; and "that is the way he put it up to me—something along that line." Reutelsterz further testified as follows: "I would not say for certain that he told me that that was what Mr. Warner had told him, but I *presume* that is where he got it from. *I didn't ask him that question.*" Here we have a presumption by Reutelsterz based on an "impression" of Dressel. Such evidence is not sufficient to establish a fraud, and fraud is the essence of unfair competition. *DeLong Hook & Eye Co. v. Hump Hairpin Mfg. Co., supra.* What we have previously said about "impressions" and "assumptions"

applies to the testimony of Dressel and Reutelsterz. That Dressel was mistaken in his "impression" is shown by a letter, referred to by us later, from Reutelsterz to appellant Mather & Company explaining the misunderstanding. It is difficult to reconcile parts of Dressel's testimony with each other. For example, he testified that Warner asked him "if he wouldn't *renew* the order"; but it does not seem to occur to Dressel that the order could not be renewed with a company that had gone out of business. He is not even sure that Warner asked him to "renew the order"; he would not say "yes or no" to that. Dressel testified that his company was receiving the weekly shipments of cards from appellee, Stevens-Davis Company, but he says that he did not suggest to Warner that this was strange if Stevens-Davis Company had gone out of business. As we have stated, the order for the cards of appellants was sent by a mistake of the stenographer of Reutelsterz to appellee Stevens-Davis Company. Reutelsterz wrote to Stevens-Davis Company explaining the error and asking that the order be returned. In this letter an inquiry was made whether Stevens-Davis Company was still furnishing the "Success Talks" and whether the business had been taken over by appellant Mather & Company. Reutelsterz also wrote a letter to appellant Mather & Company notifying the company of the mistake and making an inquiry similar to the one in the letter to appellee, Stevens-Davis Co. Appellant Mather & Company replied, saying that they had not received the order; that they had not taken over the business of Stevens-Davis Company and that "no representative of" theirs "had any authority to make any such statements." This letter of appellants indicates that if Warner made the statements attributed to him they were not sanctioned by appellants and were repudiated by appellants on the first opportunity. Reutelsterz canceled the order given to appellant Mather & Company.

Later Reutelsterz again wrote to appellant Mather & Company stating that Warner had called and returned the contract. The letter states further: "It appears that we have put Mr. Warner in a bad light with you in reporting as we did a few weeks ago. As explained before, this matter was handled through a *third party at this end,* and it now appears that there was a *misunderstanding in this transaction possibly on our part.* So we beg to apologize for any assertions we have made in connection with Mr. Warner. * * *" Reutelsterz also wrote a letter to appellee Stevens-Davis Company, in which he stated as follows: "It appears now, that the Mather & Company interviewed our timekeeper and in *conveying the information to. the writer through our timekeeper there was some little misunderstanding.* The writer was led to believe at the time that the Mather & Company had taken over the furnishing of the small pay envelope talk, but since, had an interview with Mather & Company's representative *and our timekeeper* and it all appears that there was a *misunderstanding on our part,* as their man stated in the conference that he did not wish to convey the information to us, that they were taking over this end of the business. We trust that we did not cause any great disturbance at your end, and wish to *apologize for any injustice* we might have put this company in your minds." The deposition of Warner was taken, but through some error his name does not appear in the index of witnesses in the abstract of appellants. Warner denies saying anything to Dressel from which Dressel could have drawn the inference he testified to. Warner testified that he told Dressel that appellant Mather & Company was "*replacing* Stevens-Davis Company material in a great many accounts," and cited a number of companies that thought appellant Mather & Company's "material was superior and reached the employees better." Warner says he referred to the Champion Ignition Company

and to the Long Manufacturing Company; that he told Dressel the latter company had put "our material in because they thought it was superior material" to the Stevens-Davis Company. A significant incident occurred while Warner was giving his deposition. Dressel was present. Warner was asked this question: "Did you have before you at the time you were selling Mr. Dressel the sample cards that the Mather Company used?" He answered, "Yes, I had the Mather samples." He was also asked: "Did you also have before you at that time the sample cards that the Stevens-Davis Company were issuing?" He answered: "I couldn't say positively. I think Mr. Dressel had some of those cards, didn't you, at the time we were comparing?" Dressel answered, "Possibly we had one or two." It thus appears that Warner was comparing the cards of the two companies for the purpose of convincing Dressel that the cards of Mather & Company were superior to the cards of their competitor, Stevens-Davis Company. If Warner told Dressel that Stevens-Davis Company were not furnishing cards any more and that Mather & Company had taken over the card business, it would have been absurd for him to make a comparison of the cards of the two companies. A comparison would only have been made in case the companies were active competitors.

Our view of the evidence is that Dressel's "impression" was an erroneous one derived from a misunderstanding of Warner's statement that appellant Mather & Company was *"replacing"* Stevens-Davis Company material in a great many accounts. Furthermore, even if Warner had made the statement, it would not have been unfair competition but a trade slander for which an action at law could have been maintained.

We are of the opinion that the evidence does not clearly show that Warner "palmed off" or attempted to "palm off" the goods of appellant Mather & Company for those of appellee, Stevens-Davis Company.

It is further contended by counsel for appellee that appellants were guilty of unfair competition in the sale of cards to the George Cutter Company. The sale was made to Hawkinson, the superintendent of the company, by Pfaadt, a salesman of appellant Mather & Company.

We fail to perceive on what ground counsel for appellee maintain that this transaction comes within the rule of unfair competition. The Cutter Company was using the card service of appellee, Stevens-Davis Company, when Pfaadt called on Hawkinson. Hawkinson does not testify that Pfaadt "palmed off" the cards of appellant Mather & Company or that he made any equivocal representations whatever. All that Hawkinson says is that he "bought the cards thinking it was the company that had furnished them" to him before; that he "didn't know any other company was making pay envelope cards except the Stevens-Davis Company." He testified that he signed an order for appellants' cards. In regard to the conversation he had with appellants' salesman, whose name he did not remember, he testified as follows: "That was very short, if I said anything. I just told him to go ahead and send them, and sent him on his way. I was busy. I didn't have any long talk." He was asked if he remembered what the salesman said to him and he answered that he did not. He stated further that the Cutter Company was using the cards of appellant Mather & Company at the time he gave his deposition. The testimony of Hawkinson did not present any matters that required rebuttal by the salesman Pfaadt. But Pfaadt testified that he told Hawkinson that he was from appellant Mather & Company and that he presented Mather & Company's card with his name on it. He testified further that when he sold the cards to the Cutter Company he did not know that they were using the cards of appellee, Stevens-Davis Company.

Obviously there is no unfair competition in this transaction.

The several alleged specific instances in which it is contended by counsel for appellee that appellants were guilty of unfair competition are the only ones that have been produced by appellee, although there is evidence that appellee had in 1918, when this suit was commenced, between 2,000 and 3,000 customers. Appellee also had a number of salesmen traveling throughout the country who kept in touch with the customers for the purpose of renewing contracts, and who were in a position to discover any wrongful acts of which appellants might be guilty.

It is contended by counsel for appellants that appellee has been guilty of conduct towards appellants which on the doctrine of "unclean hands" bars appellee from maintaining this suit in a court of equity.

" 'Unclean hands' within the meaning of the maxim of equity, is a figurative description of a class of suitors to whom a court of equity as a court of conscience will not even listen, because the conduct of such suitors is itself unconscionable—i. e., morally reprehensible as to known facts." 10 R. C. L., sec. 139, p. 389. The maxim that "he who comes into a court of equity must come with clean hands * * * is limited in its application to where the substance of the thing is inequitable, and the iniquity must apply to the particular subject-matter." *Barnes v. Barnes,* 282 Ill. 593. The maxim "is confined to misconduct in regard to, or at all events connected with, the matter in litigation, so that it has in some measure affected the equitable relations subsisting between the two parties, and arising out of the transaction; it does not extend to any misconduct, however gross, which is unconnected with the matter in litigation, and with which the opposite party has no concern." *Mossler v. Jacobs,* 66 Ill. App. 571. The maxim is "peculiarly applicable to a complainant" in a case of unfair competition. *Dadirrian v. Yacubian,* 98 Fed. 872, 876.

A number of alleged wrongful acts are charged against appellee by counsel for appellants. None of these acts constitutes unfair competition, and some of them do not come within the maxim of "unclean hands." There are others, however, which appear to be of a similar character to alleged wrongful acts committed by appellants. It is charged by counsel for appellants that appellee "copyrighted the text of its cards in 1916, but marked the cards as having been copyrighted two and three years later, which is contrary to the federal statutes." The question of infringement of copyright is not involved in this proceeding, and we are of the opinion that this alleged wrongful act is not related to the subject-matter of the suit, and therefore does not come within the rule.

Another act urged under the maxim is that appellants' "president swore that he had never attended the Sheldon School of Salesmanship, when, in fact, the record of the school shows that he did." This alleged wrongful conduct has been considered in connection with the credibility of the witness, but it does not meet the requirements of the rule. *Barnes v. Barnes,* 282 Ill. 593.

It is charged that the president of appellee made an affidavit containing averments in regard to the imperative necessity of the issuance of the preliminary injunction in this suit, and that no evidence was offered to sustain the averments. We do not think that this act comes within the rule.

It was brought out at the hearing that Stevens, the president of appellee, sent a copy of the preliminary injunction to the post office department at Chicago and endeavored to get the postal authorities to stop the mail of appellant Mather & Company, of appellant Mather, and of other companies that Mather was interested in; and that as a result of charges made against appellants by Stevens, Mather was "called in and given a good talking to." This conduct of appel-

lee, although indicative of hostility and vindictiveness on the part of Stevens, probably does not come within the rule. The incident, however, discloses the exercise of arbitrary power and summary procedure by the post office official, which afford a large opportunity for the abuse and oppression of a citizen at the hands of an enemy.

Mather testified that the Loose-Wiles Company canceled an order given to appellants because a salesman of appellee told the company that appellants were "a set of fakes." There is no evidence showing that appellee authorized or sanctioned this act by appellee.

The testimony of Feustman, a witness for appellee, shows that Raisig, a salesman of appellee, Stevens-Davis Company, apparently with the authority of that company, told Feustman, vice president of the Worthington Pump Company, "a great many things against" appellant Mather & Company, and tried to get Feustman to join with appellee in a suit against appellants. Feustman also testified that Raisig *"may* have said something about *going to put Mather & Company out of business."* The evidence shows that subsequently Raisig left appellee, Stevens-Davis Company, and went to work for appellant Mather & Company.

The testimony of Feustman indicates a course of conduct by appellee similar to that charged against appellants, but because of the rather indefinite character of the testimony, we do not hold that this conduct in itself would bar relief on the ground of "unclean hands."

It is charged by counsel for appellants that appellee obtained a list of appellants' customers through an employee of appellee named Darling. The evidence shows that Darling was in the employ of appellee in May, 1918; that without resigning his position with appellee he went into the service of appellants, remained there a short while, and then returned to appellee; that on his return to appellee he gave Stevens,

116    APPELLATE COURTS OF ILLINOIS.

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

president of appellee, some documents, among which was a list of appellants' customers. Darling's testimony is very evasive. He denied at first giving the list of customers to Stevens, but at the very conclusion of his testimony, as appears from the transcript of testimony in the record, he reluctantly and evasively admitted it. The record shows these questions and answers: "Q. That was the list you turned over to S-D, wasn't it, when you went back over from New Haven? A. I gave them the outfit. Q. That list was in the outfit wasn't it? A. The chief thing I remember was the letters that caught my attention. Q. That list of customers was in the outfit, wasn't it, that you gave him? A. *I think it was.* It is a hard thing for me to remember." Stevens' testimony in this regard is indefinite. He admits receiving some documents from Darling but denies that he got the list of customers. We believe that he did. It will be remembered that one of the acts alleged against appellants by appellee is that appellants through its employees wrongfully obtained a list of appellee's customers. These acts do not constitute unfair competition, but they are unethical, and in our opinion appellee is as guilty in this particular as appellants.

It is further charged by counsel for appellee that Stevens, the president of appellee, "put the spy, Nelson, in defendant's business, stole from defendant's files its correspondence and its sales talks and salesman's kit and sample case." Stevens admits that he put Nelson in the employ of appellants. He testified as follows:

"This man Nelson applied to Stevens-Davis Company for a job, stating that he had done some secret service work for the government. I asked him if he would mind going over to Mather & Company to apply for a position as a salesman and see if he could get in just to find out what they were using of our stuff. He was there, I think, about a week, or maybe two weeks.

He reported to us every day, and as a result of that we made our plans to go to Boston and recover our property, which we found there. I paid him $50 a week. I don't know what Mather & Company paid him. I think he was working on a commission for Mather & Company. Nelson didn't get anything except hearsay and this letter and the Sales Talk which we put in that deposition.'' (Stevens does not remember whether Nelson got a sample outfit from Mather & Company or not.) He (Nelson) ''reported to us daily, and as a result we made our plans to go to Boston. I assumed from the reports he got that Mather & Company were using things that they shouldn't have because of the injunction. Nelson did not turn over the sample outfit to me. We didn't want the outfit. I don't know whether he had one or not.''

The letter referred to by Stevens is the letter from Shay to Mather. These actions of appellee in connection with Nelson do not constitute unfair competition, but they are of the same kind as the ones charged against appellants, only appellee's acts are of a more aggravated and culpable nature.

It is further charged by counsel for appellants that ''Thirteen months before beginning this suit'' appellee ''debauched an employee'' of appellants ''who copied'' appellants' ''letters and sent them to'' appellee, ''who introduced them in evidence herein.'' The evidence shows that the employee of appellants that is referred to was named Smith and the employee of appellee was named Hames. Smith was reporting by letter to Hames information concerning the business of appellant, and Hames was transmitting this information to Stevens, the president of appellee. Hames was also corresponding with Mather. The letter from Smith to Hames is dated August 14, 1917, over a year before the present suit was started by appellee. The suit was commenced September 16, 1918. The letters from Hames to appellee, the letters

from Smith to Hames, and a letter from Mather to Hames were not only accepted by appellee, but are all introduced in evidence by appellee. The letters between Hames and Smith are clearly inadmissible, but no objection is urged by counsel for appellant. In fact, counsel for appellant are relying on them as evidence to support their contention that appellee has not come into the court of equity with "clean hands." All of the letters cannot be set out in this opinion, but one of them from Hames to appellee, Stevens-Davis Company, dated August 9, 1917, will serve to show the character of the transaction. The letter is as follows:

"There is a fellow working on the inside for the C. C. Co. who has taken on himself to be a kind of a Friday man to me. I always treated him pretty decent and he is willing to cut off his hands and feet for me. I am enclosing a letter I received from him. You can look it over and draw your own conclusions and act accordingly. Please return Smith's letter. I haven't answered Mather's letter. *I don't think Mather knows I am with S. D. Co.*"

A long letter from Smith to Hames, which is dated August 14, 1917, nearly a year before the bill of complaint was filed in this case, gives Hames information concerning the business plans of Mather, Fox, Rhodes and Bartlett. Smith gets this information from letters of appellants to which apparently he has access. He tells Hames, among other things, that in a letter from Rhodes to Mather, Rhodes expresses the hope that the Commercial Color Type Company, a company of Mather's, will "see fit to get out a set of these cards and other dope."

These letters will serve to show the nature of the correspondence. The manner in which they were obtained by appellee certainly should not commend them to a court of equity. A criminal court is not oversensitive about the source of evidence or the manner of procuring it because of the exigencies of a criminal prosecution, but a court of equity does not

approve of evidence of spies or detectives. *Chapman v. Chapman*, 129 Ill. 386; *Blake v. Blake*, 70 Ill. 618.

The maxim of "unclean hands" is also invoked by counsel for appellants as a bar to relief because of the method by which information and documents of appellants were obtained by appellee. Stevens, the president of appellee, under the alias of "Mr. Jacobs," together with his sales manager, Seiders, went to the Grand Pacific Hotel after Seiders, who seems to have assumed the name of "Wagner," had called by 'phone a salesman of appellants named Pfaadt, and had made an appointment for him to come over to the hotel. The testimony of Stevens explains this affair:

"In 1918 I took Seiders and had him call up Mather & Company and get them to send over a representative. Seiders called up Mather and represented that he was a shipbuilder from Duluth, Minnesota; that he had seen some of the pay envelope cards Mather & Company were making used by someone else somewhere and liked the possibility of putting them in up there. We made a date for that purpose at the Grand Pacific Hotel, and Seiders and I went over there and rented a room and had this salesman from Mather come up there. It may have been Pfaadt. We interviewed him and showed him the stuff and he saw what they were using. He had some letters with him which he did not want to leave; said he had only a few, and Seiders asked him if he would send him some at once. Seiders told him he was going away that night to Washington. There might have been a list of users, too, some prominent users. So he sent that stuff over to the hotel that afternoon and Seiders didn't come to the office. He went over and got it and brought it to the office and turned it over to me, and I looked it over and saw that it was the same set of letters as Darling had turned over to me. They were duplicates. Then, either the same day or the next day, I took them up to our patent attorney and asked him to send

120    APPELLATE COURTS OF ILLINOIS.

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

it to his Washington correspondent, our associate, and have it mailed back to Mather & Company. I sent the list of users of Mather & Company in. I made a copy of it before I sent it in. I am not sure of that. I don't think we had to do that. When this conversation was had between Seiders and Pfaadt at the hotel I was in the room lying on the bed." Pfaadt testified that he went to the room of "Wagner" at the hotel, and that Stevens came in and was addressed by Seiders, alias "Wagner," as "Mr. Jacobs"; that he, Pfaadt, left with them a list of the customers of appellant Mather & Company, and the testimonial letters of appellant Mather & Company; that the testimonial letters were returned but that the list of customers was never returned. In this matter at the Grand Pacific Hotel the deception practiced by appellee, Stevens-Davis Company, was carried to the extent of writing a letter to appellant Mather & Company signed "G. M. Wagner." Seiders had evidently represented himself as "G. M. Wagner" of the "Superior Ship Building Company, Duluth, Minnesota." The letter is in part as follows: "I did not meet our president, Mr. Batholomew, here last Friday night as anticipated and had to go on to Washington that day. * * *" Appellant Mather & Company replied to the letter, and Pfaadt wrote a letter to "Mr. G. M. Wagner" at "Washington, D. C.," asking for the return of the list of customers and the testimonial letters of appellant Mather & Company. Since Seiders, alias "Wagner," had stated that he had to go to Washington, the deception was still kept up by sending the testimonial letters of appellant Mather & Company to Washington, as testified to by Stevens, and having them mailed back to appellant at Chicago. In this transaction appellee was doing similar things to those which it denounces appellants for doing and was doing them in a more dishonorable way.

Another wrongful act alleged by counsel for appellants is that appellee after the preliminary injunction sent copies of the injunction with a pamphlet entitled "Evidence of Fraud" to the customers of appellants. The evidence shows that appellants then sent out a letter referring to the pamphlet entitled "Evidence of Fraud," stating that appellants had started suit against appellee for $50,000 and also saying that as soon as the court heard of the pamphlet and copy of injunction being sent out, "the court stopped both." In regard to appellee's sending out the copy of the preliminary injunction, Seiders, the former sales manager for appellee, testified that Stevens showed him a list of appellants' customers and told him that he "was going to write them a letter and send out notices on it about the injunction when he got it out." The evidence shows that appellee did send out the copy of the injunction and the pamphlet "Evidence of Fraud" to customers of appellants. Petit, a salesman for appellants, testified that he saw the pamphlet; that he thinks "every man in his territory was circulated with it." There was also testimony from other witnesses that they had received the pamphlet and the copy of the injunction. Appellants asked for an injunction to restrain this conduct of appellee, but apparently the court informally stopped both parties from sending out anything in regard to the injunction. We hold that the acts of appellee in this transaction come within the maxim of unclean hands, and that its conduct was most reprehensible.

Counsel for appellants further charge that "under the guise of a search warrant and under a trumped up criminal charge, complainant procured from an employee of defendants correspondence that passed between defendant and its employee," and that "these were introduced in evidence." The evidence shows that two salesmen of appellants, namely, Bartlett and McMahon, were located in Boston; that Bartlett had

the exclusive right to sell the cards of appellants in the territory of New England and that he had employed McMahon as a salesman for him. Bartlett paid his own expenses. Formerly he had been a salesman for appellee. Stevens, the president of appellee, went to Boston with an employee of appellee named Bates, had Bartlett and McMahon arrested and with a search warrant took from them documents belonging to appellee and letters that were the property of appellants. It is the taking of the letters of appellants that counsel for appellants particularly object to, although they also contend that the arrest was not made in good faith and that the criminal process was improperly used. The evidence does not show that any demand was made on Bartlett and McMahon for the return of appellee's property before the arrest was made. Bartlett testified that he was holding appellee's property as security for future commissions to which he would be entitled from appellee. There is a great deal of testimony on this transaction, the evidence showing among other things that Bates acted the role of a detective and made many false representations. Appellee had no right whatever to the letters of appellants obtained by means of the search warrant, and it was highly improper for appellee to take them. We are of the opinion that the conduct of appellee in this transaction comes within the rule of "unclean hands."

We are of the opinion that the conduct of appellee in receiving the list of appellants' customers from Darling; in deliberately putting Nelson in the employ of appellants as a spy or detective on their business; in acting in concert with Hames, who procured information of appellants' business through written correspondence with appellants' employee Smith; in procuring the list of appellants' customers from appellants' salesman Pfaadt at the Grand Pacific Hotel; in sending to appellants' customers a copy of the pre-

liminary injunction together with a pamphlet entitled "Evidence of Fraud"; in taking the letters of appellants from Bartlett and McMahon in Boston—all come within the maxim of "unclean hands." On this ground alone we think appellee should be denied the right to any equitable relief. It is true that these acts do not constitute unfair competition, but they relate directly to the subject-matter of the suit and are unethical and inequitable. They are of the same nature as many of the acts of appellants which are alleged by appellee to be wrongful. The bill of complaint of appellee, in paragraph 9, alleges that appellants "conspired together and with certain employees" of appellee obtained samples, forms and cards. This charge is of a similar nature to the conduct of appellee in relation to Darling, Hames and Smith, and to the Grand Pacific Hotel incident. In paragraph 19 the bill alleges that appellants "induced two of their employees to enter the employment" of appellee and to obtain and turn over to appellants documents, information and "trade secrets" of appellee. This allegation is similar in principle to the conduct of appellee in putting the spy Nelson in the employ of appellants. In paragraph 12 of the bill it is alleged that appellants wrongfully procured a "list of the customers" of appellee and wrote to them a letter to obtain from them wrongfully and fraudulently "testimonial" letters. This allegation corresponds to some extent to the act of appellee in procuring a list of customers of appellants at the Grand Pacific Hotel for the purpose of sending to appellants' customers a copy of the preliminary injunction and the pamphlet entitled "Evidence of Fraud."

Counsel for appellee attempt to justify the acts of appellee which we have held to come within the rule of "unclean hands" on the ground that they were done for the purpose of getting evidence for this suit, and that appellants sustained no injury from them. We

do not feel inclined to adopt the casuistical principle that the end justifies the means; and even though appellants were not pecuniarily injured, the conduct of appellee violates the same standard of ethics that it has adopted as the standard by which to judge the conduct of appellants. Furthermore, all of the acts of appellee were not committed for the purpose of obtaining evidence for this suit. The spy, Nelson, was never called as a witness; nor was Smith. And appellee's connection with Smith through Hames existed about a year prior to the commencement of this suit. Appellee's conduct in sending out the preliminary injunction and pamphlet entitled "Evidence of Fraud" had no relation to evidence for this suit; and the list of customers of appellants wrongfully obtained by appellee was improperly used in this connection even if it was also used as evidence in this suit. Appellee is bound by the same standard of ethics that it invokes against appellants.

Counsel for appellee further contend that all the profits earned by Mather & Company as a result of its "villainous and unconscionable" practices should be "ascertained and paid over to the Stevens-Davis Company," and they ask further that the decree of the lower court "be modified so as to direct that the case be referred to a master in chancery to take an account of *all of the profits* earned by Mather & Company, and *of all damages* sustained by S-D Co. through the sale by Mather & Company of pay envelope cards  *  *  * after September 17, 1918, the date of the service of said injunction writ." The views that we have expressed on the principal issues in the case render it unnecessary to consider this contention of counsel for appellee. It also follows from the views that we have expressed that in the matter of the alleged violation of the injunction by appellants the lower court erred in imposing on appellants a $500 fine for contempt, which counsel for appellee maintain "should have been $10,000."

The Stevens-Davis Co. v. Mather & Co. et al., 230 Ill. App. 45.

There are some minor questions which we have not discussed, and some evidence which we have not specifically reviewed, but we think that all of the principal issues in the case have been covered in our opinion.

After carefully investigating the facts in the case, and considering them in connection with the rule of law which we conceive to apply, together with the degree of proof required, we are of the opinion that appellee has not established a case of unfair competition.

For the reasons which we have stated in our opinion, we think the lower court erred in entering the decree. The decree is therefore reversed and the cause remanded with directions to dismiss the bill of complaint for want of equity.

*Reversed and remanded with directions.*

MATCHETT, P. J., and McSURELY, J., concur.